[L. A. No. 10171. In Bank.—March 21, 1930.]

THE CITY OF SAN DIEGO (a Municipal Corporation), Plaintiff and Appellant, v. CUYAMACA WATER COMPANY (a Corporation) et al., Defendants and Appellants; THE CITY OF EL CAJON (a Municipal Corporation) et al., Interveners and Appellants.

Shelley J. Higgins and Jas. E. O'Keefe, City Attorneys, Arthur F. H. Wright and Harry S. Clark, Deputies City Attorney, and Hunsaker, Britt & Cosgrove for Plaintiff and Appellant.

Crouch & Sanders, Hugh A. Sanders, Sweet, Sterns & Forward, Philip Storer Thacher, E. V. Winnek, Sterns,

Luce & Forward, O'Mclveny, Tuller & Myers, W. A. Sloane and Sloane & Sloane for Defendants, Interveners and Appellants.

RICHARDS, J.—A rehearing was granted herein after the decision of this cause by the court in bank in order that an even more full and careful consideration might be given to the important questions involved in this appeal. Upon such consideration we have concluded to reaffirm the conclusions arrived at in our former decision, and to adopt the language of such decision, with such emendations as may be required in view of the further light which has been shed upon the subject by former and further counsel for the respective parties, as well as by the briefs of *amici curiae* filed herein.

This action was instituted by the City of San Diego, a municipal corporation, having for its purpose the determination of the question of its title to certain rights in and to the waters of the San Diego River to which the original defendants in said action were asserting and exercising certain adverse claims. The precise nature of this action was aptly described in certain earlier appeals to this court. In the case of *Cuyamaca Water Co.* v. *Superior Court,* 193 Cal. 584, 588 [33 A. L. R. 1316, 226 Pac. 604, 605], it was thus stated: "In the pending quiet title action it will not, of course, be determined that the city is or is not entitled to any particular quantity of water. If the litigation terminates favorably to the plaintiff the only right which will be established and determined to be vested in the city will be a right to the water and the use thereof prior and paramount to the defendants' rights therein, and then only to the extent necessary for the needs of the city and its inhabitants. The amount needed is necessarily uncertain and conjectural and dependent upon conditions such as rainfall and other established sources of supply. The subject matter of the action is the establishment of the priority of right and not the quantity of water to be taken." In the case of *City of San Diego* v. *Andrews et al.,* 195 Cal. 111 [231 Pac. 726], which was a proceeding in *mandamus* to compel the respondent judge of the Superior Court of the county of San Diego to proceed to hear and determine the present cause, this court restated in substance the purpose of the instant case. The importance of the foregoing clear concept of

the nature and purpose of the present action will appear as we proceed with the consideration of the several issues involved therein. The original defendants in this action were Cuyamaca Water Company, a corporation; Cuyamaca Water Company, a copartnership, and certain individuals and the survivors and personal representatives of the members of said copartnership. The action was commenced in the early part of the year 1923, the amended complaint therein being served and filed on June 9, 1923. The defendants united in filing their demurrer to said amended complaint on June 18, 1923, said demurrer being both general and special and being based upon thirteen alleged grounds of demurrer. The demurrer was upon hearing overruled; whereupon and in December, 1923, said defendants served and filed their answer, embracing seventeen separate defenses presented by the defendants jointly, and also a number of special defenses urged on the part of certain of said defendants individually. The defendants also presented and filed at the same time their cross-complaint, wherein they asserted affirmatively the particular foundation of their adverse claims to certain portions of the waters of the San Diego River over which the plaintiff was undertaking to have established its alleged prior and preferential right. To the defendants' answers and cross-complaint the plaintiff on December 21, 1923, served and filed its demurrer upon forty-two specified grounds. Thereafter and while said demurrer was pending and undisposed of, certain other parties appeared separately in the action with applications for leave to intervene. These were one Carroll H. Smith, who in his proffered complaint in intervention alleged himself to be a resident, citizen and taxpayer of the city of La Mesa in the county of San Diego, and also an owner of property within the La Mesa Lemon Grove and Spring Valley Irrigation District in said county, which said city and said irrigation district had for the sole source of water supply of each the waters of the San Diego River, which said waters they and each of them were receiving under and by virtue of an agreement with the defendant Cuyamaca Water Company, a copartnership, with which copartnership and the surviving members thereof the said petitioner wished to join in resisting the claim of prior and preferential right thereto asserted by said plaintiff. The

said Carroll H. Smith also alleged himself to be the owner of certain lands within the so-called Ex-Mission Rancho and to be thereby entitled to certain paramount and exclusive rights to the use of the waters of said river derived from grants of said rancho to his predecessors made by and under the Spanish crown. The La Mesa Lemon Grove and Spring Valley Irrigation District also and at the same time presented its application for leave to intervene in the action, basing its alleged right so to do upon its proffered complaint in intervention, wherein were set forth substantially the same averments as were embodied in the complaint in intervention of said Smith. In addition to these, the city of El Cajon, a municipal corporation, situate in the county of San Diego, also petitioned for leave to intervene, making substantially the same allegations as to the source and right of water supply from the waters of the San Diego River as were set forth by said other applicants for leave to intervene. The court upon a hearing permitted the several parties to file their respective complaints in intervention, and in due course the plaintiff, City of San Diego, presented and filed its several demurrers thereto. Thereafter the demurrers of the plaintiff to the answer and cross-complaint of the original defendants and also to the complaints in intervention of said several interveners were submitted to the trial court for decision; and the court in ruling thereon sustained the said plaintiff's demurrer to certain specified portions of the original defendants' answer and cross-complaint without leave to amend, and also sustained the demurrer of the plaintiff to certain other specified portions of said defendants' answer and cross-complaint with leave to amend. The trial court also at the same time overruled the plaintiff's demurrers to the several complaints in intervention. The effect of these several rulings by the trial court was that of determining as a matter of law that the City of San Diego had by virtue of its incorporation and right of succession become the successor and owner of those certain prior and preferential rights to the waters of the San Diego River with which, from its inception the pueblo of San Diego, as established in the year 1834, had become invested by virtue of its formation under the laws of Spain and Mexico. The question as to whether as a matter of law the plaintiff City of San Diego had originally be-

come invested with these prior and preferential rights in and to the waters of the San Diego River by virtue of its succession to whatever rights of that nature existed in the pueblo of San Diego is thus presented upon this appeal, involving as it does the correctness of the aforesaid rulings of the trial court touching that point upon demurrer. As to the issues presented by those other specified portions of the original defendants' answer and cross-complaint, and which involve the question as to whether the plaintiff had lost its original superior right to the waters of the San Diego River derived from said source, by prescription, or by laches or by estoppel operating in favor of some or all of said defendants and their successors in interest, the trial court permitted said defendants to present amended pleadings, and upon their doing so overruled the plaintiff's later demurrers thereto; and having already overruled the plaintiff's demurrers to the several complaints in intervention, and the interveners having also amended their pleadings so as to embrace and conform to the defendants' amended answer and cross-complaint, and the plaintiff having answered the interveners' complaints and the amended cross-complaint of the defendants, the cause was thus brought to issue and proceeded to trial upon the disputed questions of fact thus presented. The cause was tried without a jury; a large mass of evidence was presented involving the testimony of many witnesses and the introduction of numerous exhibits, thus creating a record of unusual proportions, upon which were superimposed briefs and arguments of counsel evincing extraordinary effort, diligence and research. The cause was finally submitted to the trial court for its decision and in due course the findings and conclusions of law of the trial court were filed, the correctness and sufficiency of which furnish the weighty burden laid upon this court in its determination of the merits of the several appeals which have been taken and are being prosecuted by all of the parties to this action.

At the outset of our re-examination of the questions thus submitted to our determination it has been strenuously insisted by counsel for certain of the interveners herein that the City of San Diego did not by the terms of its incorporation under the new dominion become the successor to the rights of the former pueblo of San Diego, for the reason,

as urged by counsel, that by the first act of its incorporation, adopted by the legislature of California in the year 1850, it was only "the Presidio of San Diego" which was purported to be thereby incorporated and known as "the City of San Diego." It is true that in the body of said act of incorporation the area to be covered thereby is described as being "known as the Presidio of San Diego." But it is also true that the area to be included within such incorporation embraced those lands which were "included in the survey made by Lieutenant Cave J. Couts, First Dragoons, U. S. A., for the ayuntamiento," and which embraced an area of ten square miles. It is a series of significant facts that said area included the then existing pueblo of San Diego, of which the ayuntamiento referred to therein was the ayuntamiento, or in other words the town council composed of the alcaldes, the regidores and certain other municipal officers which were strictly the officers of the pueblo and none of whom were officers of a presidio, which was purely a military as distinguished from a civil foundation. The act further provided that in limiting the area to be known as the City of San Diego to ten square miles it was not to be construed so as "to divest or in any manner prejudice any rights or privileges which the presidio may hold to any land beyond the limits of the charter," and it was further provided that the corporation created by this act "shall succeed to all the legal rights and claims of the Presidio of San Diego and shall be subject to all the liabilities incurred and the obligations created by the ayuntamiento of said Presidio." These references should make it sufficiently plain that the use of the term presidio instead of pueblo in said act of incorporation was a misnomer, and that it was the intention of the act of incorporation to impose certain civil and political rights under the new dominion upon the area which was already, by virtue of its pueblo origin, in the enjoyment of certain civil and political rights under the old dominion. It may .be fairly surmised that this blunder in the way of designation was presently discovered and was promptly sought to be remedied, since we find that the act of incorporation above referred to was repealed by the legislature in 1852 (Stats. 1852, p. 223) and that by said act another form of incorporation was provided, to be known as "the Trustees of the City of San

Diego''; and that by an act of the same legislature (Stats. 1852, p. 225) the said "Trustees of the City of San Diego" were declared to be a body corporate under the style of "The President and Trustees of the City of San Diego." and were authorized and directed by such corporate name and style to "present before the board of land commissioners created by act of congress for the settlement of land titles in this state, or any court before which it may be necessary to appear for the purpose of prosecuting or defending the right or claim which the City or Pueblo of San Diego may have to land known as the common lands of San Diego." It further appears that, pursuant to such direction, the aforesaid officials of the City of San Diego, purporting to represent it in its capacity as the successor of the pueblo of San Diego, did duly present before the aforesaid congressional commission the claim of said city for the confirmation of its title "to the pueblo lands of San Diego" and that according to the recitals of the certified copy of the patent to the City of San Diego presented in evidence herein (Plaintiff's Exhibit No. 7), it was adjudged, in the course of the proceedings before said commission, "that the claim of said petitioner is valid and it is, therefore, decreed that the same be confirmed. The land of which confirmation is made is situated in the county of San Diego and is known as the pueblo or town lands of San Diego." It further appears from the record herein that the state legislature from time to time adopted certain special acts authorizing the board of trustees of the City of San Diego to deal in different ways with the pueblo lands of said city (Stats. 1855, p. 206; Stats. 1861, p. 270; Stats. 1867–68, p. 8), and it still further appears that the legislature in 1870 re-established the boundaries and areas of the City of San Diego as comprising "all that tract of land known as the Pueblo of San Diego," etc., and that in the same year the legislature adopted "An act to legalize, ratify and confirm deeds of conveyance and grants of land within the pueblo lands of San Diego." And it yet further appears that upon several occasions from the year 1872 on, the state legislature has adopted successive acts re-incorporating the City of San Diego, in each of which it is expressly stated that "all that tract of land known as the Pueblo of San Diego . . . shall henceforth be known as the City of San Diego." (Stats.

1871–72, p. 285; Stats. 1875–76, p. 806; Stats. 1889, p. 302.) It would seem to sufficiently appear from the foregoing statements of both law and fact that the findings and conclusions of law of the trial court were supported by an amplitude of evidence, wherein it expressly found and determined:

"That about the year 1834 there was founded, and until about the year 1850 there continued to exist upon what is now the site of the City of San Diego, a certain Mexican pueblo then designated as the Pueblo of San Diego; that the location and site of said Mexican Pueblo of San Diego at the time the same was founded, was, ever since has been, and now is, situated and located upon the banks of a certain unnavigable river or stream, then, ever since and now known as the San Diego river; that said stream at the time of the organization of said Pueblo of San Diego and at all times thereafter during its existence flowed into and through said pueblo, and the banks and bed of said stream from the mouth to the easterly territorial limits of said pueblo a distance of approximately five miles, were located and lay entirely within the territorial limits and formed a part of the lands and waters of said Pueblo of San Diego.

"That said Pueblo of San Diego and the inhabitants thereof from its organization during the entire term of its existence, enjoyed, asserted and exercised a preference or prior right to the use of the waters of said San Diego river for the benefit of said pueblo and the inhabitants thereof.

"That said preference or prior right of said pueblo and of the inhabitants thereof to the use of all the waters of said river necessary to supply the domestic wants of the inhabitants of said pueblo, to irrigate the lands thereof, and for other municipal purposes within the general limits of said pueblo, was a right, and the distribution of said waters for such purposes by the pueblo authorities was a trust created, imposed and recognized by the laws, orders and decrees of the government of the Kingdom of Spain and the Republic of Mexico.

"That the plaintiff herein, The City of San Diego, was incorporated on or about March 27, 1850, and thereupon became the successor and ever since has been the successor of said Mexican Pueblo of San Diego, and as such successor to said Mexican Pueblo succeeded to and acquired all the rights and privileges theretofore held or exercised by said

Pueblo of San Diego and in particular as the successor of said Mexican Pueblo of San Diego The City of San Diego succeeded to and acquired all the rights and privileges theretofore enjoyed, asserted and exercised by said Pueblo of San Diego in and to the waters of said San Diego river; that since said incorporation said The City of San Diego, as the successor to said Mexican Pueblo, has at all times enjoyed, asserted and exercised a right of priority in and to the use of all the waters of said San Diego river necessary or convenient for the use of said The City of San Diego and the inhabitants thereof, and has not in any manner, nor to any extent, surrendered, forfeited or abandoned said right, save and except in the manner and to the extent hereinafter found and declared.

"That the San Diego river is an unnavigable natural stream of water located wholly within the county of San Diego, state of California, and takes its rise in the Cuyamaca Mountains in said county on the southerly and westerly slopes thereof, and flows in a southwesterly direction approximately fifty miles from its source until it reaches the easterly boundary of The City of San Diego, formerly the easterly boundary of said Pueblo of San Diego, from which point said river flows westerly through said The City of San Diego a distance of approximately five miles, discharging its waters into the Pacific Ocean through Mission Bay in said city and county."

It will thus indisputably appear that by the foregoing findings of the trial court, supported by sufficient evidence, the City of San Diego was as to all of its property rights and powers placed within the same category as the other several cities of California which were founded upon the sites of the former pueblos thereof, and which by virtue of their said foundation became and have since remained the successors of those property rights and powers with relation thereto which were possessed by said pueblos. ■ The appellants, however, undertake to argue that the trial court was in error in holding as a matter of law that the pueblo of San Diego, by virtue of its organization as such, became entitled, under the Spanish and Mexican laws, to any prior or preferential right to the waters of the San Diego River passing above and underground through the allotted leagues which were to constitute the area of the ·pueblo lands. In

support of this argument counsel for said appellants would have us go back even prior to the Christian era and consider in our review the history of civilization in so far as the same relates to the slow, involved, and obscure development of the civil and religious institutions of ancient and medieval Spain. If for the first time in the history of our California jurisprudence such a review was being asked, or such an elaborate argument as these appellants now urge was being presented we might be disposed to consider as persuasively as we have now read interestingly the pages upon pages of Spanish history collated in that behalf. But the difficulty with the situation which appellants' diligent counsel now seek to have us reconsider is that the same question has already · on several occasions, early and late, been presented to and passed upon by this court in decisions which are uniformly adverse to the appellants' present contention. While there were other and earlier cases in the courts of this state and even in the Supreme Court of the United States which touched upon the subject of the formation of pueblos under the laws, institutions and regulations of Spain applicable to the settlement and development of lands in what had become known as "New Spain and the Indies," the great leading case upon the subject applying these laws, institutions and regulations particularly to those pueblos which had come into existence in California under both the Spanish and Mexican dominion, is the case of *Hart* v. *Burnett,* 15 Cal. 530, to 624, wherein Mr. Justice Baldwin, Mr. Chief Justice Stephen J. Field concurring, discussed at great length and with much learning the nature and extent of the rights which inhered in such pueblos by virtue of their foundation in those lands which lay within their immediate vicinage and beyond this to the extent of the additional four leagues of surrounding lands allotted to such pueblos as a result of their formal establishment as civil governments or *quasi* municipalities. It is not necessary to further refer to this leading case in other terms than those in which it has been referred to and commented upon by later decisions of the courts of this state and of the United States. In the case of *Townsend* v. *Greeley,* 5 Wall. (U. S.) 326, 336 [18 L. Ed. 547, see, also, Rose's U. S. Notes], the effect of that earlier decision was briefly but clearly stated by Mr. Justice Field, who wrote the latter de-

cision, and his language as used therein was quoted approvingly by this court in the case of *Hale* v. *Akers*, 69 Cal. 160, 166 [10 Pac. 385], which was presently to hand down its decision in the case of *Lux* v. *Haggin* in the following month of the same year and which is reported in 69 Cal. 255, 454 [4 Pac. 919, 10 Pac. 674, 715]. In this latter decision, which is the longest and most exhaustively treated cause in the history of California jurisprudence, Mr. Justice McKinstry, who wrote the opinion, went over the entire ground of the land and water rights of the owners of each in California whose title thereto looked for their derivation to the laws, institutions and regulations of Spain and Mexico. In the course of his most learned and comprehensive dissertation he referred approvingly to the decision in *Hart* v. *Burnett, supra,* as to the right and title which the pueblo had to land within its general limits. The court then proceeded to say: "By analogy and in conformity with the principles of that decision, we hold the pueblos had a species of property in the flowing waters within their limits, or 'a certain right or title' in their use, in trust to be distributed to the common lands, and to the lands originally set apart to the settlers, or subsequently granted by the municipal authorities. It may be conceded that such authorities were not authorized to make concessions to individuals of the perpetual and exclusive use of portions of the waters, without reference to the needs of the other inhabitants; or that such concessions would be an abuse of the trust. But they had a species of right or title in the waters and their use, subject to the public trust of continuously distributing the use in just proportion. . . . Each pueblo was *quasi* a public corporation. By the scheme of the Mexican law it was treated as an entity, or person, having a right as such, and by reason of its title to the four leagues of land, to the use of the waters of the river on which it was situated, while as a political body, it was vested with power, by ordinance, to provide for a distribution of the waters to those for whose benefit the right and power were conferred." After quoting certain passages from Escriche, an eminent Spanish authority upon the subject, the court further proceeded to say: "From the foregoing it appears that the riparian proprietor could not appropriate water in such manner as should interfere with the common use or destiny which a

pueblo on a stream should have given to the waters; and *semble* that the pueblos *had a preference or prior right to consume the waters even as against an upper riparian proprietor."* The court, however, suggested that it "is not necessary here to decide that the pueblos had the preference above suggested; nor is it necessary here to speak of the relative rights of two or more municipalities on the same stream." In the next and later case of *Vernon Irr. Co.* v. *Los Angeles,* 106 Cal. 237, 251 [39 Pac. 762], the question directly arose. In that case the Vernon Irrigation District, a corporation, owned a tract of land riparian to the upper reaches of the Los Angeles River, and commenced its action to enjoin the city of Los Angeles, which was and is the successor of the pueblo of Los Angeles, and certain other defendants, from so diverting the waters of the Los Angeles River as to interfere with the plaintiff's riparian right therein. The city of Los Angeles by its answer put forth the claim that by virtue of its succession to the rights of the pueblo of Los Angeles, founded in 1786, it possessed the prior and preferential right to take all of the waters of the Los Angeles River. The trial was prolonged and the findings of the trial court voluminous, in the course of which it was found and decreed that the city of Los Angeles, by virtue of its succession to rights of said pueblo, was the absolute owner of all of the water flowing in the Los Angeles River for the use of its inhabitants and for all other municipal purposes. From the judgment in its favor based upon this finding the plaintiff took an appeal and thus presented to this tribunal for determination the correctness of the aforesaid finding of the trial court. This court, Mr. Justice Temple writing the opinion, gave its most careful and exhaustive consideration to the determination of this question, in the course of which he quoted exhaustively from the Spanish and Mexican laws, approving the principles enunciated in the case of *Hart* v. *Burnett, supra,* and which were adopted by this court in *Lux* v. *Haggin, supra,* and quoted also with approval the language of the latter case above referred to and wherein it had been suggested, though not in that case found necessary to be decided, that the pueblos had a preferred right to the waters of rivers flowing through their lands, which could be asserted to the extent needed to supply the wants of their inhabitants. There

were other questions presented in that case not necessary to be here considered, but it must be conceded that the question as to the prior and preferential right of a pueblo to the waters of a river passing through it to the extent above indicated was therein squarely presented and fully upheld by the terms and scope of that decision, and that the later formed municipality organized as the successor of the pueblo fully succeeded to these rights to which the pueblo had become entitled by virtue of its creation under the Spanish and Mexican laws. The next case wherein this question arose was that of *City of Los Angeles* v. *Pomeroy,* 124 Cal. 597, 650 [57 Pac. 585], which was an action in which the city of Los Angeles undertook to condemn certain lands lying in the San Fernando Valley along the Los Angeles River and to which stream said lands were riparian, for the purpose of utilizing the same in collecting and conserving the waters of said stream for delivery to the main supply pipe and distributing system of said city. The plaintiff based its claim of right to condemn the land in question for the utilization of its asserted right to the waters of said river, in part at least, upon the averments of its amended complaint to the effect that the city, as the successor of the pueblo, was the exclusive owner of all of the waters of said river for the purpose of supplying water for the irrigation of the irrigable lands embraced in the four square leagues of the pueblo, and for other municipal uses. These averments were traversed by the defendants. The cause was tried before a jury, to which the court gave the following instruction: "The city of Los Angeles is situated on the river below these lands, and is the owner of the right to take from the Los Angeles river all the water that is reasonably necessary to give an ample supply for the use of its inhabitants and for all municipal uses and purposes for which the city may require water. This right is measured by the necessity, and if the needs increase in the future the right *will expand to include all that the needs require. This right of the city is paramount and superior to the rights of the defendants in the waters of the river."* This court upon appeal, Mr. Chief Justice Beatty writing the opinion, fully sustained said instruction in so far as it correctly stated the paramount and superior rights of the city to whatever expanding uses of the waters of said river the

pueblo by virtue of its formation possessed, and in so doing expressly approved in principle the case of *Vernon Irr. Co. v. Los Angeles, supra;* the court, however, held that the instruction was erroneous in according the city of Los Angeles greater rights to the waters of said river than those which, as the successor of the pueblo, it had received from it, the area of the modern city having expanded so as to embrace territory not within that of the pueblo lands. The next case in which the same question controversially arose was that of *City of Los Angeles* v. *Los Angeles Farming & Milling Co.,* 152 Cal. 645 [93 Pac. 869, 871, 1135], wherein the city of Los Angeles asserted its prior and paramount ownership of the use of the waters of the Los Angeles River from its source to the city and from the surface to bedrock in so far as it was necessary to supply water for the use of its inhabitants, by virtue of its successorship to the pueblo and against the asserted riparian rights of the defendant, based upon its ownership of riparian lands lying along said river some ten miles above said city. The trial court accorded the plaintiff such right and upon appeal this court, Mr. Justice McFarland writing the opinion, after stating that the only question in the case was as to whether "under the general law of the locality the old pueblo of Los Angeles and the respondent herein as its successor had and has as against appellant the prior and paramount ownership of the use of so much of the water of the Los Angeles river as is necessary for its inhabitants and for general municipal purposes," proceeded to state that "this question need not be discussed as an original one, for it has been answered in the affirmative by former decisions of this court." The cases which are above referred to are there reviewed at length and expressly approved, and after such review and approval it is said: "The foregoing decisions are determinative of the prior and paramount right of the pueblo and of plaintiff as its successor to the use of the water of the river necessary for its inhabitants and for ordinary municipal purposes. The question as to what extent the right goes, a question somewhat considered in the Pomeroy case—that is, for the use of the inhabitants of what territory and for what municipal purposes can the water be taken as against a riparian owner—does not arise and need not be considered in the case at bar." Neither, it may be said, does this latter ques-

tion arise in the present case. The law and the attitude of this court toward the law upon this subject stood as above stated during the twenty years which preceded the presentation of the same question to this court in the case of *Cuyamaca Water Co.* v. *Superior Court, supra,* which was a prior proceeding in the instant case, and in which the issues primarily involved were those quoted from in that decision in the earlier stages of the present opinion.

The appellants herein contended in the trial court and here contend that they were and are entitled to have reconsidered and relitigated the question as to whether or not a Spanish or Mexican pueblo organized in California under the laws, institutions and regulations of Spain or Mexico during their successive governments thereof, became possessed by virtue of such laws, institutions and regulations of a prior and paramount right to the use of the waters or rivers or streams passing through and over or under the surface of their allotted lands so far as may be or become necessary for the pueblo and its inhabitants, and as to whether or not a municipality organized under American rule as the successor of such pueblo succeeded to such pueblo rights. We are of the opinion that by virtue of the foregoing long line of cases, and particularly of the decision of this court in the case of the *City of Los Angeles* v. *Los Angeles Farming & Milling Co., supra,* wherein the cases preceding it were specifically reviewed and held to be determinative of this question, the subject is no longer an open one for further consideration and review before this court, and that by said decisions, so long and uniformly followed and adhered to, the proposition that the prior and paramount right of such pueblos and their successors to the use of the waters of such rivers and streams necessary for their inhabitants and for ordinary municipal purposes, has long since become a rule of property in this state, which at this late date in the history and development of those municipalities which became the successors of such pueblos we are not permitted, under the rule of *stare decisis,* to disturb.

We are not unmindful of the contention elaborately presented and argued by counsel for appellants that the pueblo of San Diego, even if conceded to have been regularly established as such in the year 1834, never became entitled to any prior, preferential or other rights in or to

the waters of the San Diego River for the reason that long prior to the alleged establishment of said pueblo the entire and exclusive right to the use and benefit of the waters of said river had been granted by the viceroy of Spain to the mission of San Diego. In support of this contention the appellants introduced in evidence before the trial court and have here presented for our inspection and interpretation a photostatic copy of such purported grant. It bears the date, according to the translation thereof with which we have been kindly furnished, of the 17th of December, 1773, and the signature, by secretary, of Bucarely, the then viceroy of the King of Spain over Mexico. It purports to approve the removal of the mission of San Diego from its former location near the presidio on the shore of the bay of San Diego to a new site several miles up the arroyo, and in order to facilitate such removal and the development of the then small and in a sense still speculative and quite problematical success of the first mission established in Alta California, it proceeded to suggest the cultivation of its surrounding lands through the use of water from the stream, and for that purpose directs the "Reverend Fathers of the Mission to acquire and administer this concession and Royal grant (privilegio) to the waters of this arroyo referred to for the common benefit of all the nation, whether Gentile or converted, who dwell to-day or in the future in the province of the mission of San Diego de Acala. This concession and the fruits also shall be held (ser tener) as to these children and their children and successors forever." The document proceeds to state in immediate connection with the foregoing that "Although a Presidio is thus placed near to the entrance of this stream near to the Port of San Diego there can be no prejudice in this respect because there is always sufficient water for the service of the soldiers, and in the topography and report of Sr. Don Miguel Castro there is evident to the south of this place a worthy river and a torrent smaller in flow and some smaller arroyos from which to drain (disaguas) the Rancho del Rey where their cattle may wander under the vigilant eye of the herdsmen." We are loathe to believe that the viceroy of Mexico, framing this document in the then far-distant capital of New Spain ever intended by its terms to confer upon this primitive and as yet largely experimental mission settlement any

such enlarged, prior, paramount or exclusive rights in and to the waters of the San Diego River as the appellants herein claim for it. Its language does not so import and it may be said to be doubtful, to say the least of it, whether even the viceroy of the kingdom of Spain in making such a concession would not have done violence to those laws, institutions and regulations of Spain which provided for the establishment of civil governments of the sort known as pueblos in new lands so as to take away from these the whole of those water rights in rivers traversing their allotment of land which would be essential to the cultivation of such lands when occupied by civil settlement. ▉ We learn from public history, of which we take judicial notice, that the civil settlement of Alta California was coequally contemplated by those who were officially in charge of the primary expedition which only four years before this purported grant had been put forth and provisioned for the discovery and occupancy of Alta California through the joint effort of Padre Junipero Serra and of Jose de Galvez, visitor-general of New Spain. In the broad and detailed plans and express decrees of the latter, precise provision was made for the foundation and development of presidios, pueblos and missions in the as yet unknown region, and these three forms of occupation were expected, as nearly as possible, to proceed simultaneously as a result of the joint military, civil and religious expedition then about to set forth. It may be fairly assumed that these joint settlements designed to be established simultaneously were also intended to function harmoniously and not to become involved in disputes over the respective jurisdiction and property rights of each. This will appear to be plain when the nature, functions and purposes of each of these foundations is considered both historically and in the light of the Spanish and Mexican laws and regulations relative to each. Presidios were purely military foundations to be occupied by soldiers, and to exist for the establishment of order and for the protection of the pueblo and mission foundations. The pueblos, on the other hand, were purely civil and political foundations, as the term itself implies, being equivalent to the English word ''town'' and signifying a civic body corporate and politic, and intended, through the cultivation of the lands with which under the

Spanish and Mexican laws it was by virtue of its foundation to be invested, to furnish sustenance for its own inhabitants and for the presidios. Mission settlements, on the contrary, were purely ecclesiastical foundations, made or to be made, in Alta California by monks or padres of the Franciscan Order, and existing and being conducted by these for the sole purpose of bringing the blessings and fruits of Christian civilization to the Indian population of Alta California, theretofore in a state of barbarism. A mission foundation in its inception possessed and exercised none of the ordinary forms or properties of civil government, but was, and was for a time at least to be, purely paternal in character, with such material possessions as were required for the maintenance and exercise of its ecclesiastical development. The lands which were to be occupied by the missions were to be held in possession by the priests for the purpose of carrying forward the main object of the mission foundation, but these lands were to be possessed, occupied and cultivated only by permission and were to be and remain the property of the nation and to be subject at all times to grants under the laws of Spain and Mexico relating to colonization. So said the Supreme Court of the United States in the case of *United States* v. *Ritchie*, 17 How. (U. S.) 525, 540 [15 L. Ed. 236, see, also, Rose's U. S. Notes]. It was thus upon this theory and assumption that the so-called secularization of the missions of Alta California by officials of the Mexican government, to which we shall presently refer, was ordered and carried forward to its disastrous conclusion. We are referred upon this subject, by counsel representing both sides of the instant controversy as an authority, to the very interesting pamphlet entitled "The Colonial History of San Francisco" and embracing the argument of John W. Dwinelle, Esq., in the case of the *City of San Francisco* v. *United States* in the District Court of the United States for the Northern District of California. We do not, however, in this case find it necessary to finally determine the scope and intent of Bucarely's concession to the mission of San Diego in respect to its new location. The reason we are not called upon to do so is that, according to the evidence educed herein, the mission of San Diego was in or about the year 1834 secularized by Governor Figueroa of Alta California and his official coadjutors, purport-

ing or pretending to act in so doing under decrees of the Mexican government enacted in the preceding year. It is not necessary for us to herein determine whether or not the secularization of the mission San Diego, put into effective operation in that and the following year or two, was in all or in any of its aspects lawful. It is sufficient to note that by the consensus of both the civil and ecclesiastical historians of the time and event it was successful and that within a very few years at most the spoliation of the mission was so far completed that its productive activities had ceased, its Indians and its priesthood had departed, the former to relapse into their aboriginal condition, and the latter to seek and find other fields of labor. The mission life in fact was destroyed and the mission lands, which by virtue of their secularization were to become part of the public domain, were within a decade thereafter conveyed by private land grant executed by Governor Pico to one Santiago Arguello, whose grant of the same was subsequently confirmed by the board of commissioners for the settlement of private land claims created by the United States government in 1851, and a patent therefor issued to said grantee a few years later. It has not been seriously, as it could not be successfully, contended herein that any of the original rights of the mission or of its founders or their successors derived from Bucarely's concession either survived the secularization of the mission or passed to Arguello or his successors by virtue of his private land grant and the confirmation thereof by the government of the United States. ▪

It follows necessarily that upon the establishment of the pueblo of San Diego in the year 1834, as found by the trial court, it became invested with whatever land and water rights it was entitled to under the laws, institutions and regulations of Spain and Mexico, and that in the possession and continued exercise of those rights it was nowise impeded or impaired by the existence of any similar or even superior rights in the mission of San Diego which either had ceased or would presently cease to be. There is, therefore, no merit in the contention of the defendants herein that they or any of them by virtue of their occupancy of the former mission lands are to be held the successors of whatever rights the mission had, since the entire right

and title of the present occupants of such lands relate as to their origin solely to the Arguello grant.

As to the claim of title to the so-called mission lands, whether derived from the foundation of the mission itself and its occupancy of said lands, or from the Bucarely concession, it is clear that such rights, if any existed, either prior or subsequent to the secularization of the mission, ceased to exist for the additional reason that such claim was never presented to the board of land commissioners as required by the act of Congress of March 3, 1851 (9 Stat. 631), and therefore lapsed and ceased to exist, under the authority of *Hihn* v. *Santa Cruz*, 170 Cal. 436, 444 [150 Pac. 62], and *Botiller* v. *Dominguez*, 130 U. S. 238 [32 L. Ed. 926, 9 Sup. Ct. Rep. 535, see, also, Rose's U. S. Notes].

As to the Arguello grant, which was, as we have seen, confirmed, it stood upon no other footing as to the rights in the lands and water within its area than that of the several thousand other private land grants in California and having been made subsequent to the establishment of the pueblo of San Diego and to its right and title to the lands and waters embraced within its allotted area, and which were also confirmed, was necessarily subject thereto, and hence in no way available in aid of the contention of the appellants and interveners herein.

We have thus, we think, disposed of every vital question presented by the defendants as appellants affecting that portion of the judgment of the trial court as to which the plaintiff herein is the respondent, and it only remains for us to consider and dispose of those portions of said judgment as to which all of the parties herein have presented their separate appeals. In that portion of the findings of the trial court which are quoted in the earlier passages of this opinion it will be seen that the prior and preferential rights of the City of San Diego as the successor of the pueblo were made subject to certain exceptions to be in said findings subsequently set forth. In these, its later findings, the trial court deals with those special defenses of said defendants and also of said interveners wherein it is pleaded and sought to be proven that whatever prior or preferential rights in and to the waters of the San Diego River the City of San Diego had or acquired by virtue of its succession to the

pueblo of San Diego it has subsequently and either wholly or partly lost by prescription or by laches or has become estopped to assert as against these defendants and interveners through certain alleged affirmative action on the part of itself or its authorized officials.

On the threshold of the discussion as to the nature of these several defenses and, if available at all to the defendants, the extent to which they or any of them should be given application to the instant case, it will be well to recur to the statement made by this court upon the former hearing in *Cuyamaca Water Co.* v. *Superior Court*, 193 Cal. 584, 588 [33 A. L. R. 1316, 226 Pac. 604], and which is quoted in the early pages of the present opinion, and from which it will appear that the plaintiff herein is not seeking by this action to have it determined that it is entitled to any particular quantity of water, based upon its prior or present use of the waters of the San Diego River, to the extent of its asserted prior and paramount rights therein. The plaintiff in its pleadings asserts no such use of said waters in the past by either its predecessor, the pueblo, or itself, further than such use thereof under such claim of right as was from time to time necessary for the needs of the pueblo and its successor the city. On the other hand, the defendants and interveners herein have both by their pleadings, their proofs and their argument, asserted and shown that neither the pueblo nor the City of San Diego ever did, prior to the institution of the present action, make actual use of any considerable amount of the waters of the San Diego River for any public or municipal or other purpose whatever, and that during the entire history of both pueblo and city the larger part of the waters of the San Diego River, except for the uses thereof undertaken by the defendants and interveners herein, would have flowed through and past said plaintiff and gone unused to the sea. In the findings of the trial court no finding is made and no estimate given as to the quantity of the waters of said river which the plaintiff or its predecessor had made use of, or could have made use of to the full extent necessary for the needs of the city or its inhabitants from time to time in the course of the development and growth of the pueblo and the city's civic life, nor is there to be found in the findings of the court or in the evidence in the case anything tending to establish

that whatever actual uses or diversions of the waters of said river the defendants and interveners herein, or any of them, are shown to have made, ever resulted in a diminution in any appreciable degree of the amount of flow of the waters of said river which the plaintiff herein or its inhabitants were from time to time putting to actual use under or in pursuance of the exercise of the city's aforesaid prior and preferential right to the waters of said river. On the contrary, the undisputed evidence in this case discloses the following facts with relation to the uses heretofore made of the waters of the San Diego River by the respective parties hereto: The maximum amount of water which the City of San Diego has annually required in order to fully supply its public needs and the needs of its inhabitants between the year 1890 and the year 1921 is disclosed by an exhibit (No. 22) introduced by the defendants herein showing the total amount of water delivered to the City of San Diego from all sources during the aforesaid series of years, from which it appears that during the year 1918 there was so delivered to said city a total of 3,634,205,289 gallons of water. This amount appears to denote the peak of the city's requirement for all of its aforesaid needs during the years immediately preceding the institution of the present action, and it may fairly be taken, therefore, to exemplify the full amount which the City of San Diego would have required to fully satisfy its prior and preferential right to the waters of the San Diego River to annually supply its aforesaid needs and uses, and hence the full amount of the waters of the San Diego River to which under its prior and preferential right it would have been entitled at and during the several years prior to the institution of this action. The evidence herein further discloses, according to a report which the Cuyamaca Water Company made and filed with the Railroad Commission, purporting to show the amount of water which it had sold and delivered to its consumers between the years 1913 and 1921 that the total amount of the waters of the San Diego River extracted therefrom and actually applied by it to such uses amounted during the year 1921 to 1,762,435,542 gallons. There is not to be found in the record herein any definite statement or evidence showing, with any degree of accuracy, the total annual outflow of water from the San Diego River; but that it is from

year to year far in excess of the amount which would be represented in the aggregate of the foregoing figures would seem to have been made sufficiently plain during the long controversy between the parties hereto over the use of said waters. Counsel for the defendants and appellants herein have presented to this court, in support of their plea of estoppel, an interesting document in the form of a resolution adopted by the common council of the City of San Diego on August 30, 1918, in response to an anxious inquiry from the city of La Mesa, and which will be more particularly adverted to hereafter, and from which resolution it is made to appear that "during the past twenty years eighty-four per cent of the water of said San Diego river has gone to waste in the Pacific ocean," and, further, "that the undeveloped waters of the San Diego river would, if impounded, prove entirely adequate to meet all present and reasonably probable future demands of the City of San Diego and of the neighboring communities adjacent to the San Diego river watershed." It is important that the foregoing facts relative to the volume and use of the waters of the San Diego River should be borne in mind dealing with the questions which we are about to consider touching the respective rights of the parties hereto to the waters of said river as affected by the defenses of prescription, laches and estoppel urged by the defendants and appellants herein. In dealing with these defenses it is also important to bear in mind the nature of each and the differences, if any, between them.

▮ It should at the outset be understood and stated that the pueblo rights, and hence the rights of its successor, the City of San Diego, to whatever of the waters of the San Diego River were from time to time required for the needs of the pueblo and of the city and of the inhabitants of each, were rights which were essentially "governmental" in character, as much so in fact as were the rights of the ancient pueblo and modern city to the public squares or streets, and that the term "proprietary," as employed with reference to certain commercialized uses made by municipalities and other public bodies, of water, light and power, for example, has no application to the fundamental rights of the plaintiff herein to its ownership of its foregoing classes of property dedicated and devoted to public uses. (*Ames* v. *City of*

*San Diego,* 101 Cal. 390, 394 [35 Pac. 1005].) It should also be noted upon the threshold of the impending discussion that the questions which might arise upon any attempted use of the waters of the San Diego River by the plaintiff herein for the supply thereof to the inhabitants of areas outside of the corporate limits of the original pueblo, whether such areas were or were not within the four league square allotment of lands to said pueblo, are not presented or presentable in the instant case, and hence that whatever authorities may have been cited bearing upon such questions are inapplicable, since, as was aptly stated in our earlier decision (193 Cal. 584 [33 A. L. R. 1316, 226 Pac. 604, 605]) "the subject matter of the action is the establishment of the priority of right and not the quantity of water to be taken."

It should also be noted at this stage of the discussion that whatever rights the original defendants herein are entitled to claim and assert in the waters of the San Diego River, or any portion thereof, are rights and claims which rest for their support upon the several appropriations made of such waters by the Cuyamaca Water Company, a copartnership, or by the members thereof, and by the San Diego Flume Company, their predecessor and original appropriator of such waters, to the extent of the use thereof. We hold to be without merit the contention of these defendants that they derive their rights to such waters from a higher source, viz.: from certain rights acquired by them, or certain of them, under the congressional act of July 26, 1866 (14 Stat. 253, chap. 263, sec. 9), and the supplementary act of January 12, 1891 (26 Stat. 714, chap. 65, sec. 8), and that such rights derived from such source are superior to any right whatever in the waters of said river held by the City of San Diego, as the successor of such pueblo. We find from an examination of these congressional acts, without going into further detail, that they consisted in certain action taken by the United States government at a time subsequent to the vesting in the City of San Diego of whatever rights it possessed and still possesses in the waters of San Diego River by virtue of its successorship to the rights and interests of such pueblo and which were confirmed by the action of the aforesaid commission, and that whatever permissive grants of rights of way to private persons over public lands lying along the upper reaches of the San Diego

River were made were subordinate and not superior to the already vested rights of the plaintiff herein, derived from its succession to the pueblo. (*Los Angeles Farming & Milling Co.* v. *City of Los Angeles*, 217 U. S. 217 [54 L. Ed. 736, 30 Sup. Ct. Rep. 452, see, also, Rose's U. S. Notes, and cases cited.) With these preliminary observations we pass to a discussion of the remaining questions presented for our determination by the original defendants and by their successors in interest, the interveners herein.

The first of these questions relates to the defense of prescription.

The nature of the right claimed to have been acquired in the waters of a flowing stream by prescription rests as a prime essential upon an adverse use thereof by the claimant under a claim of right which has, to the extent thereof and for the required term of years, been acquiesced in by the person or persons otherwise entitled to the ownership and enjoyment of the waters thus adversely abstracted from said stream and to enforce those rights by appropriate action. It is needless to cite authorities to a proposition thus deeply grounded in the law of waters; but there are certain instructive cases which bear directly upon the situation of the parties to this action as disclosed by the record herein. The first of these is that of *Anaheim Water Co. et al.* v. *Semi-Tropic Water Co.*, 64 Cal. 185 [30 Pac. 623]. This was a case which involved certain alleged conflicting riparian rights to the diversion of the waters of the Santa Ana River, which formed the dividing line between two ranchos, from the owners of one of which the plaintiffs had derived by grant the right to use a certain definite amount of the waters of said river, to which the lands of the grantors were riparian, and of the other of which the defendant was the owner and was entitled to all of the riparian rights incident to such owner, unless the same or some portion thereof had been lost by prescription. The trial court found that the plaintiffs for many years had openly, notoriously and continuously appropriated and used the waters of said river to the full capacity of their ditch, claiming the right so to do adversely to all the world; but the court also found that prior to a year or so before the commencement of the action such diversion and use on the part of the plaintiffs, even though thus claimed to have

been done adversely, had never interfered with the use which defendant during the same time was making of said waters, and that with the exception of the aforesaid brief time before the commencement of the action there had at all other times been sufficient water flowing in the river to supply the wants and demands of all of the parties to the action. In dealing with that situation this court (p. 192 of 64 Cal. *supra*) said: "In the face of such facts as these, how can we be expected to hold that as against the owners of the Santiago Rancho the plaintiffs have established any prescriptive right? In order to establish a right by prescription, the acts by which it is sought to establish it must operate as an invasion of the right of the party against whom it is set up. The enjoyment relied upon must be of such a character as to afford ground for an action by the other party. This is thoroughly settled. Now it is very clear that while there was sufficient water flowing in the river to supply the wants and demands of all the parties, its use by one could not be an invasion of any right of any other; and as the court below found, as a fact, that until within a year or two prior to the commencement of the action, there was sufficient water flowing in the river to supply the wants and demands of all the parties, it· is plain that the plaintiffs as against the owners of the Santiago Rancho have acquired no right by prescription." The next case to which we would refer is that of *Faulkner* v. *Rondoni*, 104 Cal. 147 [37 Pac. 883], wherein (without stating the facts of the case) we find that the doctrine above announced was expressly approved, the trial court having found that during the period claimed to have given rise to the prescription there had been sufficient water in the stream for the uses of all of the parties to the action and that, therefore, there had been no such invasion of the rights of one which could form the basis of a prescriptive right in the other. In the quite recent case of *Pabst* v. *Finmand*, 190 Cal. 128 [211 Pac. 11, 13], the doctrine above quoted from *Anaheim Water Co. et al.* v. *Semi-Tropic Water Co., supra*, was again approved, the court saying that the use by the adverse claimant "was not hostile unless there was an actual clash between the rights of the respective owners. While there was sufficient water flowing down the stream to supply the wants of all parties, its use by one was not an invasion of the rights of the

other." It is also true, as stated in the concluding paragraph of *Pabst* v. *Finmand, supra,* that "the exercise of a mere riparian right can never be hostile to the land below. Where, however, the use is under such circumstances as to be adverse and under a claim of right asserted against lower riparian owners it may ripen into prescriptive title." For the most recent statement of this principle see *Scott* v. *Fruit Growers' Supply Co.,* 202 Cal. 47 [258 Pac. 1095], where the same principle is enunciated. It is contended by the appellants and interveners herein, however, that the foregoing several cases and the principles decided therein have no application to the contentions of the respective parties in the instant case, for the reason that each and all of these cases relate to the respective rights of riparian owners in the several streams to which they refer, and that said rights differ essentially from those which are asserted by the respective parties in the instant case. It is true that as between contesting riparian owners, and even as between riparian owners and upper appropriators, the rights of each to the proportion to which each is entitled in the waters of the particular stream differ materially from the rights which the parties to this action assert or deny. But conceding this to be true, the misconception of the appellants herein consists in emphasizing these differences and in losing sight of the uniformity of application of the principles upon which prescription rests and which, as we have seen, require, both in the cases cited and in the case at bar, the presence of an adverse use as the essential basis of its assertion. It is for this reason that the principle enunciated in the foregoing cases has direct application to the situation presented in the case at bar. The City of San Diego by virtue of that prior and preferential right which it derived from the pueblo "to the use of all of the waters of the San Diego river necessary to supply the domestic wants of the inhabitants of said pueblo, to irrigate the lands thereof and for other municipal purposes within the general limits of said pueblo," has never thus far in its history possessed and is not now asserting any right of action to prevent the actual diversion of any quantity of the waters along the upper reaches of the San Diego River or its tributaries, whether undertaken by the defendants and interveners herein or their predecessors, or any other persons whatever, which has not at any

particular time interfered with such exercise of its aforesaid rights in the waters of said river as from time to time in the course of its growth and history as a municipality it became possessed of. The right of said city was thus always "uncertain and conjectural," depending upon the particular needs of the city or its inhabitants at each particular stage in its development as a municipality, and it would be the height of unreason to hold that the pueblo in its primitive beginnings and the city in the infancy of its corporate life should have been bound to be continually taking arms against users of the upper waters of the stream to an extent which constituted no interference with its present use or right to use such waters at the time of such diversion. It follows that for this reason, also, no right by prescription exists or has ever existed in favor of these defendants and interveners, or either or any of them, arising out of their asserted adverse use of the waters of the San Diego River. The city is not in this action asserting a present right to any such remedy, but, on the contrary, and in the language of our earlier opinion, "the subject of the action is the establishment of the priority of right and not the quantity of water to be taken." It thus appears that the present action is not in any sense remedial but is purely declaratory in its nature and in the relief which, in so far as the plaintiff is concerned, is sought thereby.

Finally, and with direct reference to the defense of prescription, it may be stated as a general rule that no invasion of the rights of property which are held by a public or municipal corporation in perpetual trust for public uses can be held sufficient to furnish the basis of a defense based solely upon prescription. The cases fully supporting this general principle have already been cited, but will be further referred to in considering the subjects of laches and estoppel, to which we shall now address ourselves.

With respect to the defense of laches which the defendants and interveners present and urge, little need be said, since what has immediately heretofore been stated fully applies to such defense. The City of San Diego and its officials could not in reason be charged with laches in the assertion of something with respect to which no right of assertion existed and with respect to which no adverse invasion has thus far occurred. There would seem to be an-

other and all sufficient reason why the defense of prescription and of laches ought not to be available to the defendants as against the plaintiff in the present action. The right which the Pueblo of San Diego and the plaintiff herein, as its successor, acquired in the waters of San Diego River by virtue of the pueblo foundation was essentially a public right and, to employ the language of the findings of the trial court, "was a right and the distribution of such waters by the pueblo authorities was a trust created, imposed and recognized by the laws, orders and decrees of the Kingdom of Spain and the Republic of Mexico." In the case of *Cuyamaca Water Co.* v. *Superior Court, supra,* this court adopted the language upon this subject in *Lux* v. *Haggin, supra,* wherein it was stated that "the occupants of lands within the city, the pueblo's successor, are beneficiaries only to the extent that they are entitled to the use of such water and at such times as accords with the laws regulating the public and municipal trust." In the case of *Vernon Irr. Co.* v. *Los Angeles,* 106 Cal. 237 [39 Pac. 762, 765], it was stated with special reference to the rights to the waters of the Los Angeles River which the city had derived from the pueblo of Los Angeles that "the waters of all rivers were, under the Spanish and Mexican rule, public property for the use of the inhabitants." If this be true, it follows necessarily that the public right and public trust which the pueblo and its successor, the City of San Diego, had in these waters in no respect differed from those other public rights and properties which the state and its various subdivisions and agencies possess and administer; and it has been uniformly held that such public rights cannot be lost nor the public trust as to their administration and exercise be destroyed either by adverse possession or by laches or other negligence on the part of the agents of the state or municipality who may from time to time be invested with the duty of their protection and administration. (*People* v. *Kerber,* 152 Cal. 731–733 [125 Am. St. Rep. 93, 93 Pac. 878], and cases cited.) The case of *Ames* v. *City of San Diego,* 101 Cal. 390–392 [35 Pac. 1005], will, when carefully examined, be found to fully uphold this view. We are, therefore, of the opinion that for the above additional reason the defense of prescription and laches urged by the defendants and interveners herein cannot be upheld.

The defense of estoppel, however, rests upon an entirely different foundation in both law and fact from that underlying the foregoing two defenses. The defense of estoppel rests upon the doctrine that a right conceded for the purpose of such defense to exist in a party, he shall not be permitted to assert against another to the latter's injury because of the existence and proof of certain facts and conditions which would render its assertion inequitable. The question as to the application of this well-defined legal proposition as between the parties to an action in the nature of things depends upon the facts of each particular case. Whether the facts of this particular case are such as to permit the application of this doctrine to the plaintiff in its capacity as a municipal corporation and with respect to the latter's "prior and preferential right to the waters of the San Diego river" as above defined, is the problem to which we must finally devote our attention. The essential facts as developed in the evidence educed herein, bearing upon this problem, are not, with certain exceptions to be noted, the subject of material dispute. The original defendants in this action were Cuyamaca Water Company, a copartnership, and certain parties alleged to be surviving members of the legal representatives of certain deceased members thereof; also, Cuyamaca Water Company, a corporation, which does not seem to have much to do with the case. The evidence in the case, stated as concisely as possible, discloses that in the year 1885 the San Diego Flume Company was organized for the purpose of developing the water supply along the upper reaches of the San Diego River and its tributaries which had theretofore been undeveloped and largely unused, with a view to conserving and utilizing the same upon the region lying between the City of San Diego and the mountains, wherein that stream and its tributaries had their source, and the lands of which region prior to said time, being semi-arid, had been but thinly populated and little used. In the course of this development and during the next few years the San Diego Flume Company expended large sums of money, estimated by the trial court to have been in excess of one million dollars, in the creation of dams, diversion works, pumping plants, ditches and flumes for the diversion and distribution of said waters to an extent hereinafter to be stated. The Cuyamaca Water Com-

pany, a copartnership, ere long succeeded to the rights and property of the San Diego Flume Company and during the intervening years between 1889 and the date of the institution of this action has augmented the expenditures, continued and extended the activities and administered the resources thus derived from its predecessor, with the resultant effect that within the wide region reached and benefited by the aforesaid development and distribution of the waters of said river, to the extent hereafter to be noted, an extensive productivity has been attained; orchards, vineyards, farms and homes have been created, and cities and towns have been established, such as the city of La Mesa, the city of Lemon Grove, the city of El Cajon and other growing communities containing as a whole several thousand inhabitants and constituting prosperous centers of civic and community life, and all of which have, during all the years of their creation and growth, received their water supply from the waters of said river as thus developed and distributed by or through the Cuyamaca Water Company. Of recent years certain irrigation districts have been formed and are being operated within said region and one of these, to wit, the La Mesa, Lemon Grove and Spring Valley Irrigation District, has recently secured an option upon, if not actually acquired, all of the rights and properties of the Cuyamaca Water Company, and has thus become the principal party in interest in the eventuality of the present action, in so far as the defendants and interveners are concerned. The legal foundation of the San Diego Flume Company and also of its successor, the Cuyamaca Water Company, rested originally in certain formal appropriations located in due course of the laws permitting the same along the course of said river and its tributaries, and to an amount in the volume of water claimed to be as hereinafter stated. In pursuance of these appropriations certain quantities of said waters have been diverted and distributed, to an extent also hereinafter to be designated. It would seem, also, that certain of the defendants put forth certain claims of right herein, depending upon their alleged ownership of certain lands riparian to said stream. During all of the earlier years of the activities of the San Diego Flume Company and of the Cuyamaca Water Company in the appropriation to the extent thereof of the waters of said river and also

of the diversion and distribution thereof to the volume and extent thereof; and during all of the earlier years of the settlement, development and growth of the region and of the several corporate communities therein as a direct result of the application of said waters to said otherwise semi-arid region, the City of San Diego regarded quiescently, and in fact it may be said approvingly, the foregoing development of its "back country" through the aforesaid appropriation, diversion and use of the waters of the San Diego River. It had every reason so to do and it had no reason to do otherwise, since its own advancement, progress and prosperity in both business and population were being greatly enhanced thereby, and since, also, its own actual uses of the waters of said river were being in nowise diminished or impaired. It is true, as averred by the defendants and interveners herein and as found by the trial court, that the City of San Diego on various occasions in its municipal history and through its successive legislative bodies has granted certain rights and privileges to private persons and corporations to develop water by wells and works of various kinds within the limits of the former pueblo lands, and has even contracted to purchase such works when constructed and such water when developed for the use and benefit of the inhabitants of said city; but it is also true, as found by the trial court, that none of these arrangements was made with any predecessor of the defendants or interveners herein so as to entitle the latter to claim that acts and efforts on the part of the city to have developed its own water supply within its limits and for the use of its inhabitants amounted to such an admission of the validity of the appropriation and uses which the defendants and interveners were undertaking upon the upper reaches of the San Diego River as would operate to constitute an estoppel. The essential elements of an estoppel, even as between private persons, were thus far, and up to at least the year 1914, entirely lacking. The defendants and their predecessors, the San Diego Flume Company, in entering upon and prosecuting their plans for the appropriation and diversion of the waters along the upper reaches of the San Diego River and its tributaries cannot lay claim to having been misled as to their rights as a matter of law to thus appropriate and use the waters of said river, since they must be held to have known, both as

a matter of fact and as a matter of law, of the existence in the City of San Diego of the aforesaid prior and preferential right of the city to such waters and to the assertion thereof whenever the expanding needs of the city or its inhabitants required such assertion. With respect to the knowledge which the predecessor of the defendants and appellants herein—and by which knowledge they are bound— had upon this subject as a matter of fact, the evidence in this case sufficiently shows that the San Diego Flume Company, from the date of its organization and first appropriation of the waters of the San Diego River, was fully informed as to the prior and paramount right of the City of San Diego to the use of the waters of the San Diego River, and that upon the advice of its attorney it caused to be inserted in its contracts with the consumers express provisions protecting it, as to its said consumers, against the assertion of such right by said city; and at as early a date as the year 1900, when certain litigation was instituted against the San Diego Flume Company by or on behalf of its consumers to enjoin said company from preferring the City of San Diego pursuant to its said rights in the matter of the water supply from said river then being furnished to said city, the San Diego Flume Company expressly pleaded in its answer the existence of the paramount right of said city and the terms of its said consumers' contracts inserted in recognition thereof. The evidence further discloses that at various times during the decade or more of controversy preceding the institution of the present action the Cuyamaca Water Company, a copartnership, through its most active and aggressive member, Mr. Fletcher, was fully advised from time to time as to the existence of the aforesaid prior and paramount claim of right on the part of said city. The findings of the trial court based upon the foregoing state of the record herein are full and ample and are as follows:

"It is not true that the plaintiff has been guilty of any carelessness or any culpable negligence resulting in the defendants, or any of them, being misled as to the state of the plaintiff's title as set forth in its amended complaint. Neither is it true that the defendants were at all times ignorant, or were at any time ignorant of the claim of the plaintiff to the prior and paramount right to the use of the water

of the San Diego river. Neither is it true that the defendants had no convenient or ready means of acquiring knowledge respecting the prior and paramount right of the plaintiff in and to the waters of the San Diego river, but, on the contrary, it is true that the defendants and their predecessors in interest at all times had convenient and ready means of acquiring knowledge respecting such right, and at all times knew of plaintiff's claim to such right. It is not true that such acts, omissions and declarations of the plaintiff as are herein found to have been performed, were said or done through fraud, and it is not true that any act or omission or declaration of the plaintiff constituted a fraud upon the defendants or any of them, and it is not true that any act or omission or declaration herein found to have been done or declared by the plaintiff has injured the defendants or any of them, or justified the defendants or any of them in believing that the plaintiff did not own or claim to own an estate in the waters of the San Diego river as alleged in said amended complaint; neither is it true that the defendants nor any of them relying or acting upon any belief fraudulently induced by the plaintiff have expended any money in the development of the waters of the San Diego river. Neither is it true that the defendants nor any of them, or their predecessors in interest, relying or acting upon the belief that the City of San Diego did not own the prior and paramount right to the use of the waters of the San Diego river, expended large or any sums of money in developing said waters and acquiring an estate therein.''

That said defendants and appellants, as a matter of law, must be held to have had knowledge of the existence in the City of San Diego of its prior and preferential rights in and to varying amounts of water of the San Diego River, according to its expanding needs, may be said to rest not only upon the general proposition that all persons are held to a knowledge of the law, but may be said to also rest upon the fact that this court from a date as early as the decision of the case of *Hart* v. *Burnett, supra,* and at intervals during the intervening years between that early time and the institution of the present action was engaged in uniformly upholding the prior and preferential right of cities founded upon a previous pueblo existence to the waters of

142

such streams as flowed through them. The record herein discloses that the San Diego Flume Company was fully advised by astute and able counsel of the existence of such prior rights in the City of San Diego as a matter of law. In the light of the foregoing findings of the trial court with respect to the knowledge of the aforesaid rights of the City of San Diego, which these appellants are held to have possessed as a matter of fact, and by which knowledge they must also be held to be bound as a matter of law, and in the light of the further fact of the total absence from this record of any showing on their part that whatever acts of diversion and use of the waters of the San Diego River they or their predecessors therein have thus far engaged in have in any degree constituted an invasion of the vested rights of said city in and to the waters of said river, the following cases are instructive. The first of these is the case of *Anaheim Water Co.* v. *Semi-Tropic Water Co., supra,* to which reference has been made with relation to rights to be gained by prescription, and wherein also the subject of estoppel is considered, the court saying: ''With respect to the estoppel, relied on by the plaintiffs, it is sufficient to say that, as the findings of the court below show that there was sufficient water flowing in the river in 1857 and for nearly twenty years thereafter to supply the wants and demands of the owners of each of the ranchos bordering on the stream, the owners of the Santiago Rancho were neither called upon to object to the diversion and appropriation by the predecessors of the plaintiffs, nor had they any right to object thereto. No right of theirs was interfered with; nor does it appear that there was any fraud, misrepresentation or concealment of any kind practiced upon the predecessors of the plaintiffs by the owners of the Rancho San-tiago.'' In certain cases, hereinafter to be noted, and also in the case just cited, we have had occasion to quote with approval what was held in the case of *Biddle Boggs* v. *Merced Min. Co.,* 14 Cal. 368: ''There must be some degree of turpitude in the conduct of a party before a court of equity will estop him from the assertion of his title—the effect of the estoppel being to forfeit his property and transfer its enjoyment to another.'' It is to be noted in this immediate connection that the claim of estoppel which the upper appropriator of the waters of a stream undertakes

to assert against a lower claimant thereto, based upon the latter's acquiescence, must be founded not upon the amplitude of the former's claim as set forth in his recorded appropriation of such waters, nor by the carrying capacity of his ditches or flumes, but upon the actual diversion and use of said waters and only to the extent thereof. (*Pabst* v. *Finmand*, 190 Cal. 124, 133 [211 Pac. 11]; *Haight* v. *Constanich*, 184 Cal. 426 [194 Pac. 26]; *Northern California P. Co.* v. *Flood*, 186 Cal. 301 [199 Pac. 315].) We understand the foregoing authorities to state the settled law as declared in this state touching this subject, notwithstanding the array of authorities presented by the appellants and interveners herein from other jurisdictions apparently laying down a different rule.

Even, however, if it were to be conceded that a right based upon estoppel could arise by virtue of mere acquiescence in its assertion as between private persons, we are satisfied that no such claim of right could come into being as against a municipal corporation, founded upon its mere acquiescence or that of its officials in the diversion by any number of upper appropriators, or even of upper riparian owners of the waters of a stream, to the use of the waters of which such public or municipal corporation was entitled as a portion of its public rights and properties held in perpetual trust for public use. The general rule upon this subject is stated in volume 10, California Jurisprudence, page 650, and cases cited, as well as certain limited exceptions to the rule. The defendants and interveners, appellants herein, have referred us to no case wherein the mere passive acquiescence of a public corporation or its officials in the invasion of its rights of property, however long continued, has been held to operate as an estoppel against its assertion of those rights. They have, however, called our attention to certain cases which are claimed to constitute exceptions to the operation of the general rule, and to which we shall presently refer. It is sufficient at this point in the discussion to state that in so far as, prior to the year 1914, the plaintiff herein may have passively acquiesced in the acts of the defendants and interveners in the diversion and use of the upper waters of the San Diego River no estoppel *in pais* can be predicated thereon to any extent whatever in favor of the defendants and interveners herein for the

several reasons above set forth. Among the cases above referred to are *City of Los Angeles* v. *Cohn*, 101 Cal. 373 [35 Pac. 1002], wherein the principle of estoppel *in pais* was given application to an action brought by the city of Los Angeles to recover possession of a small tract of land lying at the intersection of Spring and Main Streets in said city, and which was claimed by it to be a part of a public street. That, however, as the court stated in its decision, was an exceptional case from the fact not only that the defendants had been in possession of the property in question adversely and exclusively for almost forty years, during which time they had erected substantial buildings thereon, but that the city, through its officers, had affirmatively and at the time of the erection of such buildings misled the defendants into the belief that the city laid no claim to the premises in question, and that acting upon such belief and assurance the defendants had erected their structures upon the property and occupied the same undisturbed for many years. This case bears no similitude to the case at bar. Counsel also direct our attention to the case of *Ames* v. *City of San Diego*, 101 Cal. 390 [35 Pac. 1005]; but a reading of that case discloses that a clear distinction was drawn therein between the two classes of pueblo lands which the City of San Diego holds in succession from the former pueblo, namely, those held in trust for a specific public use, such as a park, which cannot be alienated and the title to which cannot be lost by adverse possession; and those lands, such as house lots, which the city, as successor to the pueblo, held, and which might be alienated by it, and which it was held, for that reason, might be lost by adverse possession. There is no comfort for the defendants herein in the decision of this court in that case. Counsel for the defendants and interveners further insist that under the Spanish and Mexican laws pueblo lands might be lost by prescription. It is needless to follow this argument or the authorities cited therein further than to state that the United States in taking over the territory known as Alta California under the treaty of Guadalupe-Hidalgo, agreeing therein to recognize the existence and protect the ownership of certain land titles within said territory, did not also take over and agree to adopt the statutes of limitation of either Spain or Mexico as applicable to lands or waters devoted to a public use.

It may be well, in addition to what has been heretofore stated, to deal, with somewhat more of particularity, with the events transpiring between the years 1914 and the date of the institution of the present action inclusive, in so far as these affected the relations and respective rights and claims of the original parties to this action and to the use of the waters of San Diego River. The record herein discloses that in the early part of the year 1914 the city attorney of the City of San Diego, acting in obedience to a resolution theretofore adopted by the common council thereof, requesting him to make an investigation of the rights of the city in and to the waters of the San Diego River and submit an opinion thereon, presented to that body a formal report upon that subject, going with much of detail into the history of the pueblo foundation, and citing and quoting at length from the decisions of the state and federal courts touching the nature and extent of the water rights of pueblos in and to the waters of streams passing through them, and making particular application of these decisions to the nature and extent of the water rights of the pueblo and City of San Diego in and to the waters of the San Diego River. This opinion was published in pamphlet form at or shortly after the date of its presentation, and was admittedly brought to the attention of both the defendants and the interveners herein about that time. It would seem to follow of necessity that if the asserted rights of the defendants and interveners, to whatever extent, if any, we may find them to have been assertable, had not up to that time ripened into rights resting in the doctrine of estoppel, no later assertion of these rights and no later acts in the way of a further appropriation or diversion of said waters could be made the basis for a claim of right which did not then exist, unless these could be held to find their support in some very definite withdrawal of the claim of the city to that prior and preferential right to the use of such waters which was thus definitely set forth by the foregoing report the city attorney made in the month of January, 1914, and then or shortly thereafter brought to the notice and knowledge of the defendants and interveners herein. In the year 1917, however, the City of San Diego took a very definite step in the direction of making available to itself certain of the

waters of the San Diego River not as yet conserved or appropriated to any beneficial use. In that year a bill was introduced in the United States Congress, at the instance of the City of San Diego, purporting by its title "to grant rights-of-way over government lands for reservoir purposes for the conservation and storage of water to be used by the City of San Diego, California, and adjacent communities." The text of the measure thus presented in Congress had reference to a proposed reservoir to be constructed along the upper reaches of the San Diego River and upon lands which formed a portion of an Indian reservation, the title to which was in the United States. While this measure was pending before certain committees of Congress during that and the following year the passage thereof was strenuously opposed by certain representatives of the defendants and interveners herein, their contention being that the grant of such reservoir rights, with the resultant construction of the proposed reservoir, would constitute a serious interference with the already vested rights of the defendants and interveners to the beneficial use of the waters of the San Diego River. In furtherance of the urge of these opponents and in an effort to so far limit the scope and purpose of said grant and the exercise of whatever reservoir rights and uses were to be asserted thereunder, it was sought to have the City of San Diego, through its officials then in charge of its municipal affairs, adopt certain resolutions disclaiming any intent on the part of said city to interfere with the uses then being made of the waters of the San Diego River by the defendants and interveners herein, and in pursuance thereof certain resolutions were adopted by the then governing body of said city touching this subject. A considerable portion of the record consists of details of this proceeding in Congress, and there is considerable discussion in the brief of counsel with respect to the attitude thus taken by the City of San Diego with relation thereto. It would seem, however, that the trial court fully set forth and adequately and correctly considered and treated this entire episode in its findings of fact herein, and that with particular reference to the resolutions adopted by the governing body of the City of San Diego, having reference to the aforesaid controversy, correctly stated therein that "It is not true that by

said resolutions, or by any resolution, or act of said common council, the plaintiff herein, acting by or through its legislative body, has expressly or impliedly admitted the ownership by the defendants or any of them, of the right to use and develop the waters or any of the waters of the San Diego river prior, superior or paramount to the rights of the plaintiff.'' With respect to the action of the Congress of the United States as to the form and scope of said proposed legislation, in view of the developed opposition of the defendants and interveners herein to the passage thereof, the trial court found that: ''It is not true that the public lands committee of Congress, or any other congressional body, or any member of Congress, upon receiving or noting the protest of defendants, or any of them, or of any city or community served by Cuyamaca Water Company, or for any other reason, refused to adopt said proposed bill or house resolution unless or excepting this plaintiff admitted either expressly or impliedly an ownership and estate of these defendants, or any of them, in or to the waters or the use of the waters of the San Diego river. On the contrary, it is true that the Congress of the United States and the public lands committee of the Senate and House of Representatives, and each of them, and the members thereof, explicitly and unequivocally set forth in said bill, and insisted in setting forth in said bill, a provision declaring that nothing therein contained should be construed as affecting or intending to affect, or in any way to interfere with, the laws of the state of California relating to the control, appropriation, use or distribution of water used in irrigation or for municipal or other uses, or any vested rights acquired therein, and that the secretary of the interior and the City of San Diego, in carrying out the provisions of said act, should proceed in conformity with the laws of said state of California.'' The foregoing findings of the trial court based, as they are, on much probative evidence, which fully supports them, would seem to set at rest the question as to whether the plaintiff had lost, by its affirmative action, or by way of estoppel, whatever rights we have found it to be possessed of prior to the year 1914, to the assertion of its paramount use whenever required of the waters of the San Diego River. There is, however, the further finding of the trial court already

adverted to, which would seem to be conclusive as to the existence of any right whatever resting in estoppel on the part of the defendants and interveners herein to a superior right to that of the plaintiff in the use of the waters of the San Diego River, and which we deem it apt to requote, as follows: "It is not true that the plaintiff has been guilty of any carelessness or any culpable negligence resulting in the defendants, or any of them, being misled as to the state of the plaintiff's title as set forth in its amended complaint. Neither is it true that the defendants were at all times ignorant, or were at any time ignorant, of the claim of the plaintiff to the prior and paramount right to the use of the water of the San Diego river. Neither is it true that the defendants had no convenient or ready means of acquiring knowledge respecting the prior and paramount right of the plaintiff in and to the waters of the San Diego river, but, on the contrary, it is true that the defendants and their predecessors in interest at all times had convenient and ready means of acquiring knowledge respecting such right, and at all times knew of plaintiff's claim to such right. It is not true that such acts, omissions and declarations of the plaintiff as are herein found to have been performed, were said or done through fraud, and it is not true that any act or omission or declaration of the plaintiff constituted a fraud upon the defendants or any of them, and it is not true that any act or omission or declaration herein found to have been done or declared by the plaintiff has injured the defendants, or any of them, or justified the defendants or any of them, in believing that the plaintiff did not own or claim to own an estate in the waters of the San Diego river as alleged in said amended complaint; neither is it true that the defendants nor any of them relying or acting upon any belief fraudulently induced by the plaintiff have expended any money in the development of the waters of the San Diego river. Neither is it true that the defendants, nor any of them, or their predecessors in interest, relying or acting upon the belief that the City of San Diego did not own the prior and paramount right to the use of the waters of the San Diego river, expended large or any sums of money in developing said waters and acquiring an estate therein."

When we come to consider the essential and elementary basis of the doctrine and plea of estoppel in the light of the foregoing facts and findings of the trial court the conclusion would seem to be inevitable that the elements of estoppel are entirely lacking in this case. These elements of estoppel are all embraced in the definition thereof found in subdivision 3 of section 1962 of the Code of Civil Procedure, which reads as follows: "Whenever a party has, by his own declaration, act or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot, in any litigation arising out of such declaration, act or omission, be permitted to falsify it." This court has frequently been called upon to interpret and apply the foregoing provision of the code. It is necessary to cite but two of the most recent cases in which it has done so. One of these is *Mercantile Trust Co.* v. *Sunset etc. Co.*, 176 Cal. 461, 472 [168 Pac. 1037, 1041], wherein this court said: "It is of the essence of an estoppel *in pais* that the party asserting such estoppel should not only have been ignorant of the true state of the facts, but that he should have relied upon the representation or admission of the adverse party." The other case is that of *Staniford* v. *Trombly*, 181 Cal. 372, 378 [186 Pac. 599, 601], wherein it was said with reference to the facts of that case: "There was an absence of the essential elements of estoppel, namely, false statements or concealments, or conduct amounting to false statements or concealments, with reference to the boundary made by one having knowledge, actual or virtual, of the facts, to one ignorant of the truth, with the intention, resulting in consummation, that he should act upon such false statements or concealments, or equivalent conduct."

In the presence of the foregoing findings of fact as made by the trial court, and in the light of the indispensable elements as thus stated by this court essential to be proven in order to the formation of a basis for the defense of estoppel, it is as difficult to understand as it is impossible to uphold the further findings and conclusions of the trial court to the effect that the defendants and interveners are entitled to the benefit of their plea of estoppel to the extent of their diversion and use of the waters of the San Diego River in the amount of twenty-seven cubic feet per second,

or in any other amount, and that as against such right resting solely in such use the City of San Diego is estopped to assert its prior paramount right to the use of the waters of the San Diego River. That this conclusion may be fraught with certain disturbing consequences, affecting chiefly the interveners herein, and which have been insistently and even passionately urged by their counsel in the presentation of this prolonged controversy, can be held to furnish no reason for a deprival of the plaintiff herein of its ancient, prior and paramount right to the use of the waters of the San Diego River as defined by this court upon the former hearing. It if be true, as the trial court expressly found it to be, that the San Diego Flume Company and its successor, the Cuyamaca Water Company, entered upon and prosecuted their plan for the diversion of the waters of the San Diego River with full knowledge as a matter of law, and also with full means of knowledge as a matter of fact, as to the existence of the prior and paramount right of the plaintiff as the successor of the pueblo to the use of the waters of the San Diego River, as such right is set forth and defined in our former opinion, and if it be further true, as it must be conceded to be, that the interveners are entitled to assert and insist upon no further rights or equities in respect to the use of said waters than those which were possessed by their predecessor in interest, the Cuyamaca Water Company, we are unable to perceive upon what principle of equitable application the public trust in which the City of San Diego holds its prior and paramount right to the use of the waters of said river to the full extent which the needs of the expanding city from time to time require, is to be subverted for the simple and only reason that other persons or other communities along the upper reaches of the river, with full knowledge of the aforesaid prior and paramount rights of the plaintiff, may have undertaken, at a considerable expenditure of money, to make a beneficial and profitable use of such waters.

The only remaining question for our determination upon these appeals relates to that portion of the judgment of the trial court wherein it purported to enjoin the defendants and interveners from the doing of certain constructive work in connection with their conservation and diversion of the waters of the San Diego River except in subordination

to the prior and paramount rights of the plaintiff therein, and also purporting to restrain the defendants and interveners from the assertion of any claims of right or title in or to the waters of the San Diego River except in subordination to the paramount rights of the plaintiff therein, and save and except in the amounts and to the extent in said judgment specified. In respect to the aforesaid portions of the judgment it is clear that the trial court has gone beyond the scope and issues of the instant action. This, as we have seen, and as this court has already decided upon the former proceeding, is an action purely declaratory in character and is one wherein the plaintiff has neither pleaded nor attempted to prove any facts which would entitle it to any other or affirmative relief beyond that of having its prior and paramount right to the use of the waters of the San Diego River established. This being so, the trial court was in error in attempting to give to its determination of this matter any other or further effect than that of a declaratory judgment.

It follows from the foregoing conclusions that the judgment herein must be and is hereby modified so as to read as follows:

It is adjudged, ordered and decreed that the plaintiff the City of San Diego was at the time of the commencement of this action and now is the owner in fee simple of the prior and paramount right to the use of all the water (surface and underground), of the San Diego River, including its tributaries, from its source to its mouth, for the use of said the City of San Diego and of its inhabitants, for all purposes, and that said defendants, and each of said defendants, said cross-complainants, and each of said cross-complainants, and said interveners, and each of said interveners, have not, and no one or more of them have any estate, right, title or interest in or to said waters, or any part thereof, or in or to the use of the same, or any right to take or use said waters, or any part thereof, save in subordination and subject to said prior and paramount right of the plaintiff, the City of San Diego, and that the plaintiff is entitled to no other or further relief herein than that afforded by the remedy of the declaratory judgment above set forth, and that the judgment herein, as thus modified, is affirmed, and

that each party hereto shall pay its own costs upon these appeals.

Shenk, J., Seawell, J., Waste, C. J., Langdon, J., Curtis, J., and Preston, J., concurred.

Rehearing denied.

All the Justices present concurred.