[Civ. No. 10386. Fourth Dist., Div. One. Aug. 20, 1971.]

SECURITY PACIFIC NATIONAL BANK, as Executor, etc.,
et al., Plaintiffs and Appellants, v.
CITY OF SAN DIEGO, Defendant and Respondent.

## COUNSEL

Richard A. Del Guercio, Frank M. Gunter, Oscar C. Sattinger and Lillian S. Sattinger for Plaintiffs and Appellants.

John W. Witt, City Attorney, and C. M. Fitzpatrick, Chief Deputy City Attorney, for Defendant and Respondent.

## OPINION

**WHELAN, J.**—Security Pacific National Bank, as executor of the estate of Florence Edna Blunt, deceased, and Joe Blunt (plaintiffs) appeal from a judgment in favor of City of San Diego (City) in an action seeking, by way of declaratory relief, a determination of the rights of the parties in a parcel of land which is owned in fee by plaintiffs but flooded with impounded water used by City as part of its water system.

The property (hereinafter referred to as plaintiffs' land), which is the

subject of the litigation consists of that portion of lots 67 and 68 of Rancho Mission in San Diego which lies below the 100-foot contour line of what is now Murray Reservoir, formerly known as La Mesa Reservoir. Both portions together equal approximately 102.6 acres.

Plaintiffs' predecessor in interest, the Junipero (incorrectly referred to as "Junipierro") Land and Water Company, entered into an agreement on May 14, 1887 (the 1887 agreement) under the terms of which San Diego Flume Company (Flume Company) granted to Junipero an option to a perpetual supply of all water needed for domestic use on and irrigation of Junipero's land, including lots 67 and 68; limited, however, to a certain measurable amount of water for each 15 acres, and at a fixed price. Junipero's land for which a water supply was contracted was something over four full sections. The water was to be taken from a flume or reservoir, both of which were to be built by Flume Company. Junipero was also granted the right to use power derived from the water flow in the flume in order to pump the water onto Junipero's land. Additionally, the agreement provided:

"And [Junipero] in consideration of the premises, does hereby grant to [Flume Company], the right of way for the aqueduct and flume which [Flume Company] shall construct across [Junipero's land] or any part of the same; also as much of said lands for purposes of a dam and reservoir and the flooding to be occasioned thereby as [Flume Company] shall cover with such dam when completed and submerge under the water to be contained in such reservoir, provided that such dam (which with the said reservoir shall be contructed in the north branch of Chappel Canon in said tracts sixty seven and sixty eight) shall not exceed one hundred feet in height; and [Junipero] also grants to [Flume Company] the right to divert from the San Diego River above El Cajon the portion of the water of said River, apportioning to the tracts of lands aforesaid . . ."

After execution of the 1887 agreement, Flume Company created a water system by constructing an earthen dam in the north branch of Chappel Canon. Also constructed was a diverting dam below the confluence of the San Diego River and Boulder Creek, which point is east of Lakeside near the Capitan Grande Indian Reservation. From that point water was transported through a wooden flume to the Eucalyptus Reservoir just east of La Mesa. From Eucalyptus Reservoir the water was transported through an open ditch to the earthen dam in Chappel Canon, thus forming Murray Reservoir. The San Diego River was then the sole source of water flowing into the reservoir and the dam and reservoir were an integral part of the Flume Company water system.

The right created by the 1887 agreement was transferred in 1910 by

Flume Company to James A. Murray (Murray) along with all other property owned as a part of the water system; concurrently Murray sold a one-sixth interest in the water system to Ed Fletcher, who with Murray operated the system as a partnership under the name Cuyamaca Water Company (Cuyamaca). The deed of June 1, 1910, from Flume Company to Murray included in the property conveyed a 24-inch pipeline laid about 1896, connecting the La Mesa Reservoir and a 20-inch pipeline leading to the City of San Diego, the point of connection being about three miles west of the reservoir.

In 1918 Cuyamaca completed a 100-foot-high concrete dam to replace the earlier earthen dam at a point downstream therefrom submerging the old dam and capable of flooding plaintiffs' lands to the 100-foot contour line. The new dam was, and the old dam may have been, on lot 19 owned by Cuyamaca. The open ditch conduit delivered its water to the reservoir at a point on Cuyamaca's property held in fee. A 1921 map of the Cuyamaca system showed that, as a part of the system, from the Eucalyptus Reservoir there was a pipeline that led to a reservoir in University Heights in the City of San Diego, and that pipeline was joined by one leading from Murray Reservoir.

In 1925 Murray and Fletcher completed a sale of Cuyamaca's assets, except for certain of the assets hereafter mentioned, to La Mesa, Lemon Grove and Spring Valley Irrigation District (District), which subsequently changed its name to Helix Irrigation District (District), as it is at present.

We take judicial notice from the published decision of *San Diego* v. *La Mesa etc. Irr. Dist.*, 109 Cal.App. 280 [292 P. 1082], that when Cuyamaca sold to District its distribution system within the boundaries of La Mesa, Lemon Grove and Spring Valley and the real property and facilities necessary therefor, Cuyamaca retained that part of its distribution system which was used to supply water to the City of East San Diego, Normal Heights and a part of Kensington Heights, with an agreement that District should sell and supply to Cuyamaca one million gallons of water per day for such purposes; that those areas thereafter were incorporated within City; that Cuyamaca leased that limited distribution system to City with an option to buy together with its right to receive the one million gallons daily from District; and City undertook to and did supply water to the users within the areas mentioned; that the one million gallons daily was not water surplus to the needs of the users within District, but was water dedicated to an equally public purpose.

Meanwhile, City had established its prior and paramount right to the waters of the San Diego River and its tributaries for the use of its inhabi-

tants to the extent needed as against Cuyamaca and District (*City of San Diego* v. *Cuyamaca Water Co.*, 209 Cal. 105 [287 P. 475] [decided March 21, 1930]). The Supreme Court, in declaring the prior and paramount rights of City, declared, at page 130: "[T]he pueblo rights, and hence the rights of its successor, the City of San Diego, to whatever of the waters of the San Diego River were from time to time required for the needs of the pueblo and of the city and of the inhabitants of each, were rights which were essentially 'governmental' in character, as much so in fact as were the rights of the ancient pueblo and modern city to the public squares or streets, and that the term 'proprietary,' as employed with reference to certain commercialized uses made by municipalities and other public bodies, of water, light and power, for example, has no application to the fundamental rights of the plaintiff herein to its ownership of its foregoing classes of property dedicated and devoted to public uses."

About 1935 City completed construction of El Capitan Dam on the San Diego River downstream from the diverting dam below the confluence of Boulder Creek with the San Diego River contemplated by the 1887 agreement and thereafter constructed.

Preparatory to the construction of El Capitan Dam, City was successful in condemning as a part of the dam site the lands formerly owned by Cuyamaca and sold by it to District, and described in the contract between the two latter as El Capitan Reservoir Site. (See *City of San Diego* v. *Cuyamaca Water Co.*, 209 Cal. 152 [287 P. 496].)

As a result of the developments mentioned, City and District sought a basis of accommodation by which a right to continue to obtain water from the San Diego River might be secured to District within defined limits. In 1931 a suggested basis of agreement was drafted under which, among other terms, City would receive without charge permanent storage rights in Murray Reservoir not to exceed 5,000 acre-feet at one time; District, for a period of 10 years, would have the right to divert at a point above El Capitan Dam not to exceed a total gross annual average of 10,000 acre-feet of water, to store in El Capitan Dam not to exceed 10,000 acre-feet at any time, and to pump from City's El Monte Basin an amount annually equal to the amount permitted to be diverted above and stored in El Capitan Dam, thereby reducing to that extent the amount stored in El Capitan Dam.

That tentative basis of agreement was implemented by a formal agreement on January 30, 1933, by which among other things District granted to City the permanent right to the use of Murray Reservoir for the storage of not to exceed 5,000 acre-feet of water; and City granted to District the

permanent right to store in El Capitan Dam that amount of water which District was conceded the right to divert by the tentative basis of agreement signed by the parties respectively on November 30 and December 1, 1931.

Thereafter the only water obtained by District from Murray Reservoir would have been that furnished by City under its contractual obligation to supply District with five million gallons daily. In practice that five million gallons had not been taken. It would not necessarily have come from Murray Reservoir, but facilities had been set up for its reception by District at City's Alvarado treatment plant after having been brought there from City's El Monte pumping plant which was fed by two pipelines, one from El Capitan Dam containing native water, the other from San Vicente Dam, where Colorado River water was received from the San Diego Aqueduct and stored.

Ever since April 13, 1959, and for a long time prior thereto, the storage capacity of Murray Reservoir was 5,000 acre-feet. If water were brought to the 100-foot level, the capacity would be about 6,000 acre-feet; but the condition of the dam did not permit that to be done. Cracks in the buttress of the dam had appeared by 1959 and the Department of Water Resources of California, Division of Safety of Dams, required the water surface be maintained 15 feet below the spillway. The department also demanded the dam be repaired.

As of April 13, 1959, the situation as to Murray Reservoir was described thus by City and District, in an agreed statement:

"The capacity of the reservoir is so small that there is no useable storage space for District water over and above the City's permanent storage rights. Actually, except for the delivery of water to the District's 69th St. Pumping Plant (Maximum: 5 mgd) the District makes no use of the facility for its own operations. The City has gradually taken over the entire use and operation of the dam and reservoir (except for the District's recreational project and concession) and the divided responsibility for maintenance, repairs and improvements is confusing and unhealthy."

A table of the inflow and the outflow from Murray Reservoir, commencing in 1941 and ending in 1965, shows that slightly over 96 percent of the outflow was drawn by City; that slightly over 56 percent of the total inflow was of Colorado River water, although Colorado River water was first stored in Murray Reservoir in 1948.

In December 1961, District quitclaimed to City its rights in and to the reservoir which included the Flume Company property and ease-

ments appurtenant thereto, including the right to flood plaintiffs' land. In July 1962, District also transferred to City its interest in the equipment, improvements and facilities which had been used for fishing and recreational purposes.

Only a part of the storage basin of Murray Reservoir occupies plantiffs' lands. The remainder of the storage basin and the actual dam structure are on land owned by City in fee, acquired from District.

Plaintiffs derive their title to the underlying fee of a part of the basin from Madge Blunt Waring, who, by mesne conveyances, had succeeded to the title of Junipero to the underlying fee and to Junipero's adjacent lands. In 1953 Madge Blunt Waring conveyed to City the lands owned by her adjacent to the dam site, but not her interest in the area flooded by the water stored behind the dam.

City has acquired title also to the lands adjacent to the dam site that had been owned by Flume Company and later passed on to District.

Among the findings of the trial court are these: that the parties to the 1887 agreement intended to create an easement to flood plaintiffs' land appurtenant to a water system to be created by Flume Company, described by the court as consisting of the diverting dam at the confluence of the San Diego River and Boulder Creek, the wooden flume from the diverting dam to Eucalyptus Reservoir, Eucalyptus Reservoir, the open ditch connecting Eucalyptus Reservoir to the earthen dam in the north branch of Chappel Canon and Murray Reservoir; that Flume Company and Junipero intended the water system to be prospective in operation and to accommodate the future needs of that system; that District intended to make no further use of Murray Reservoir or its flooding rights after the date of the transfer of those rights to City, "about November 1961; District informed City that District had determined, and with the approval of City did determine, permanently to relinquish and sever Murray Reservoir and the floodage rights from District's water system, although the reservoir would remain subject to the obligations of District under a fishing and recreational concession expiring July 1962.

Among what are styled conclusions of law, the trial court held that in making the conveyance in December 1961 District did not abandon the floodage rights."

The court concluded there was no extinguishment of the easement; and that the easement rights vested in City.

Plaintiffs contend that the findings made show as a matter of law an abandonment by District of the right to flood plaintiffs' land, and that the easement was extinguished by nonuse, or, alternatively, by surcharge. Plaintiffs argue that the system, as owned by District, was wholly distinct from the system operated by City and was entirely different in purpose and character; that District abandoned the easement through a series of

acts including its cessation of use of Eucalyptus Reservoir and the open ditch connecting it with Murray Reservoir and its limited use of Murray Reservoir itself; and that the series of acts culminated in complete abandonment when District transferred all its rights in Murray Reservoir to City; and that the finding of the court below that District intended to make no further use of Murray Reservoir or its floodage rights after the date of its transfer of those rights to City is tantamount to a ruling District intended to abandon the easement prior to that date.

The findings are largely evidentiary; neither they nor the evidence taken as a whole show an abandonment as a matter of law by District. Unless the transfer by District could be said as a matter of law to be a transfer of the rights without a transfer of the property to which they pertained, it did not show an abandonment, any more than the various earlier transfers of the rights showed an abandonment of those rights by the transferors.

Much emphasis is placed by plaintiffs upon City's answer to an interrogatory in the following language:

"The City does not contend that the Helix Irrigation District did not intend to abandon its flooding rights on the designated Waring property when it made the deed to The City of San Diego but does contend that the deed transferred to the City any and all rights which the District had in the designated Waring property."

That is construed as an admission by City that District intended to abandon the flooding rights within plaintiffs' definition of abandonment of an easement. The trial court did not construe the answer as such a concession or admission, nor do we.

It may be more reasonably paraphrased as follows:

"City contends the deed from District to City transferred to City all rights which District then had in plaintiffs' property; unless that constitutes abandonment there was no abandonment."

The trial court found the easement was appurtenant to a water system to be created. Civil Code section 801, subdivision 10 declares a land floodage servitude may be attached to other land. ■ The right to flood land or to store water thereon may be appurtenant to ownership of water, considered as real property. (See *Fudickar* v. *East Riverside Irr. Dist.*, 109 Cal. 29, 37 [41 P. 1024].) Water rights granted to Flume Company by Junipero were water rights in the San Diego River, to be taken not at the property owned by Junipero riparian to the stream, but at a point far upstream; to that water City then had prior and paramount rights as later determined;[1] if the right to store such water was appurtenant to

---

[1] "[T]he San Diego Flume Company, from the date of its organization and first appropriation of the waters of the San Diego River, was fully informed as to the

ownership of the water, then City might be said to have had such right. We shall not quibble as to whether a water system as a whole is land. ■ In theory the physical assets of a water system could be located wholly upon easements and rights-of-way upon lands owned by someone other than the owner of the water system.

The only land described in the findings as belonging to Flume Company when the easement was created was a portion of lot 19, Rancho Mission, found to have been a part of the water system to be created. The monumental structure of the dam and a part of the storage basin are upon lot 19.

To whatever other land undescribed in the 1887 agreement the flooding easement could be said to be appurtenant, it is surely appurtenant to that upon which the physical structure of the dam rests which contains the waters that as a result flood the lands of plaintiffs. The present structure, built upon land owned by Cuyamaca thereafter passed to District and since 1961 has been and is now owned by City.

In fact the agreement of 1887 may have been intended to create rights in plaintiffs' predecessor, Junipero, of equal value with the rights given to Flume Company. The latter were given in consideration of Flume Company's agreement to permit Junipero, at its option to be exercised within two years, to take a certain measured amount of water at a certain price from either Flume Company's flume or reservoir for domestic and irrigation purposes on over four sections of land; and to generate power from the flow of water in Flume Company's flume. With the exception of property within the 100-foot contour line, City has succeeded to the title of any land previously owned by Madge Blunt Waring that had been owned by Junipero in 1887.

As viewed by plaintiffs, the water system to which the easement became appurtenant was one in which the water to be stored came only from the San Diego River via a flume line to the Eucalyptus Reservoir, and thence by a certain open ditch to the Murray Reservoir, and which water system devolved by mesne conveyance to District, the water from which

---

prior and paramount right of the City of San Diego to the use of the waters of the San Diego River, and . . . upon the advice of its attorney it caused to be inserted in its contracts with the consumers express provisions protecting it, as to its said consumers, against the assertion of such right by said city; and at as early a date as the year 1900, when certain litigation was instituted against the San Diego Flume Company by or on behalf of its consumers to enjoin said company from preferring the City of San Diego pursuant to its said rights in the matter of the water supply from said river then being furnished to said city, the San Diego Flume Company expressly pleaded in its answer the existence of the paramount right of said city . . . ." (*City of San Diego* v. *Cuyamaca Water Co.*, 209 Cal. 105, 140 [287 P. 475].)

was to be used thereafter only within District, and the rights in which were held in trust by District for the use of persons living within it.

Plaintiffs argue that the trust under which District held its water rights represented a higher public interest than that for which City owns and operates its water system, which plaintiffs say it owns as a proprietor and not in any governmental capacity. That argument is untenable in view of the quoted holding in *City of San Diego* v. *Cuyamaca Water Co., supra,* 209 Cal. 105, 130.

In addition to the argument that abandonment of the easement is shown by the disuse of the La Mesa Ditch and the Eucalyptus Reservoir, the little use made by District of Murray Reservoir and District's final act of giving a quitclaim deed of its rights in Murray Reservoir, plaintiffs argue that the use of the easement in excess of the terms of the grant, and particularly an attempt to transfer the easement to strangers, extinguished the easement.

Without denying the correctness of the theory or questioning the authority of the cases cited in support thereof, we point out that such excess use commenced and such transfer in effect was made in 1933 and has not been questioned until the present action was commenced in September 1964 based upon a claim filed in May 1964.

If plaintiffs' view as to the manner in which the right to use of the land in question was circumscribed is correct, then it must be said that such right has been greatly enlarged by the use actually made for a period of some 30 years before this action was commenced.

In 1933 District claimed a right to grant, and did grant to City, the permanent right to store 5,000 acre-feet of water in the reservoir, and City thereafter exercised that right.

Continuously since 1948, more than half of the water stored by City in Murray Reservoir has been water from the Colorado River. By 1951 City's storage of water represented the maximum use of the reservoir's practical capacity; that maximum use has been continuous at least since that time.

Water has not been brought to Murray Reservoir by the open ditch since 1950 at least. A United States Geological Survey map published in 1953 shows the La Mesa Ditch as abandoned. Necessarily the bringing of water to Murray Reservoir from the El Monte station called for the construction by City of a pipeline into the reservoir. Clearly, the only water brought into Murray Reservoir during that period has been through City's 68-inch pipeline; any other water has been the result of local run-off.

Since 1951 District has used the reservoir for recreational purposes. Involved in that use were the rental of 36 fishing boats, 16 portable toilet buildings, picnic tables and benches, and other personal property sold to City by District in June 1962.

·The use of boats on the water would not of itself be a use that would interfere with the rights of the owner of the servient tenement. But the use of the shoreline for picnicking and the use thereon of sanitary facilities would be a use beyond that permitted by flooding to the 100-foot contour line.

Not all the land within the 100-foot contour line belongs to plaintiffs; a part of it belongs to City, and the head of the dam itself is on City-owned land. It is not therefore possible to know to what extent plaintiffs' land has been used for such activities along the shore line.

If plaintiffs' views were held by their predecessor in interest, Madge Blunt Waring, the latter gave no evidence thereof. As an owner of lands adjacent to Murray Reservoir until 1953, she seems to have acquiesced in the assertion by District of a right to make the agreement with City under which City was given what in practice was the exclusive right to store water in the reservoir and in connection with which City ran a 68″ pipeline to the reservoir through which it delivered water not only from the San Diego River but the Colorado River; she acquiesced, too, in City's assertion of a right to do those things, and in District's use of the shore line in connection with its recreational program.

The assertion and exercise of all those rights must be said to have continued uninterruptedly for more than 10 years, openly and notoriously. The use of a pipeline rather than a ditch, and the storage of Colorado River water, were for an even longer period; City's use of the reservoir for storage purposes has continued uninterruptedly since 1941.

City's use has been under a claim of right adverse to everyone excepting District. City's continuous use under the circumstances could have ripened into a right to such use by prescription.

If it could be said that District had abandoned the easement, such abandonment could also be said to have occurred when it ceased introducing water into Murray Reservoir and granted City the right to do so.

In making that grant, however, District did not abandon the rights it had to use Murray Reservoir for the storage of water and the incidental flooding of plaintiffs' land, but made use of those rights in bargaining for larger storage space elsewhere in the greater interest of the people it served.

■ It is recognized that easement rights which have been granted may be enlarged by an enlarged claim exercised openly, notoriously, continuously and adversely during the period of prescription. (*Bartholomew* v. *Staheli,* 86 Cal.App.2d 844, 849-850 [195 P.2d 824]; *Hoban* v. *Bucklin* 88 N.H. 73 [184 A. 362, 186 A. 8, 11]; *Cotton* v. *Pocasset Mfg. Co.,* 54 Mass. (13 Met.) 429.[2])

No findings were made either that City and/or District had by prescription acquired a right to use plaintiffs' lands in the manner in which they are now being used, or that a cause of action in plaintiffs to object to such use was barred by limitations. The evidence, however, would support affirmative findings on both scores had such issues been framed.[3]

The findings rather are consistent with the theory that the use to which the property is being put is within the intention of the original grant; however, the long-continued acquiescence in such use by plaintiffs and their predecessor in interest may properly be considered as lending support to the findings by way of an interpretation placed upon the extent and nature of the easement granted.

As noted by the trial judge in his oral discussion of the case, the 1887 agreement is susceptible of the interpretation that there was a grant of as much land for purposes of a dam and reservoir and the flooding to be occasioned thereby as would be covered by a dam 100 feet high and by water in the dam. Junipero's right to plant trees was on any part of the land granted for the purpose of a reservoir down to a line 50 feet distant from the highest water. However, the court found there was a grant of an easement, as alleged in plaintiffs' complaint. That again seems to have been the interpretation placed by the parties upon the grant as shown by the language of the conveyance from Cuyamaca to District.

The 1887 agreement, however, does not describe the right to build the dam and impound water as appurtenant to any specific property or conglomeration of property. While it grants also Junipero's rights as a riparian owner on the San Diego River and a right-of-way for a part of the course of a flume by which water from that river might be conducted to the dam to be built, Junipero was to be entitled to purchase water at a fixed price and in a certain quantity, which may or may not have been the equivalent of its rights as such riparian owner.

---

[2]*Atchison, T. & S.F. Ry. Co.* v. *Abar,* 275 Cal.App.2d 456, 466 [79 Cal.Rptr. 807], mentions the possibility that such enlarged rights might be acquired but noted there was no evidence to support such a claim. The same was true in *Bartholomew* v. *Staheli, supra,* 86 Cal.App.2d 844, and *Hoban* v. *Bucklin, supra,* 88 N.H. 73.

[3]The applicable period of limitations or prescription is five years.

It is clear, however, that as early as the sale by Cuyamaca, its only source of water was not that diverted from the San Diego River near its joinder by Boulder Creek. It is equally clear that Flume Company, at the time it sold to Murray, had a pipeline running from Murray Reservoir to City, and that other areas were being served by Cuyamaca at the time of its sale to District that were not then a part of City but later were incorporated therein.

The theory that Murray Reservoir and the waters impounded therein were dedicated solely to the furnishing of water to District and the inhabitants within its boundaries can be based only upon the ownership of the reservoir by District within the period following District's acquisition thereof. That ownership and use are no more determinative of the character and scope of the rights granted in 1887 than is the history of the period preceding District's ownership or the history following District's grant to City in 1933 of the permanent right to impound 5,000 acre-feet of water.

So far as the water system to be created by Flume Company could have been described prior to its acquisition by District, it was one to supply people in San Diego City and San Diego County water having its principal source in the San Diego River; considered as a system for the exploitation and distribution of water resources, it is no longer under a single ownership; ownership of certain of the water resources is in City and the corresponding obligation of serving the people of the City of San Diego attaches to City; the remaining water resources are owned by District, which has a corresponding obligation to serve its people.

In the fulfillment of their respective obligations, City and District have cooperated to obtain the most beneficial use of the rights given by the 1887 agreement. Those rights still appertain to an integral part of the water system that was to be created, and are owned by the owner of that integral part of the original system.

Plaintiffs argue the quitclaim deed by which District in 1961 purported to transfer its rights in the reservoir to City is void for failure to comply with the provisions of the Irrigation District Law.

The court below found the board of directors did not at any time determine by resolution entered upon the minutes that either the reservoir or the floodage rights were no longer necessary for District purposes.

The powers of District are governed by the Irrigation District Law, which consists of division 11, sections 20500 through 29978 of the Water Code.

Water Code section 20560 provides: "Districts, regardless of the date of formation, are subject to the provisions of this division."

District, for the greater benefit of the people living within it, had the right to exchange the storage rights in Murray Reservoir for greater storage rights elsewhere. (Wat. Code, div. 11, §§ 22075,[4] 22227,[5] 22228[6] and 22437.[7])

The giving of the quitclaim deed of December 5, 1961, was not a significant step in the history of District's transferral of rights in Murray Reservoir. For District's purposes, it meant a transfer of the responsibility as nominal owner to maintain the dam in a safe condition. The use to which District put its Murray Reservoir property and rights, in conveying them to City in the series of transactions described, was not the equivalent of disposing of surplus property.

If Water Code section 22500[8] is intended to cover the manner of disposing of property surplus to District's needs, it may apply to the disposal of the recreational facilities; it could hardly apply to a transaction by which District, in exchange for the rights to the limited storage capacity of Murray Reservoir, obtained larger storage and other rights elsewhere. ■ We hold that the successive steps by which District transferred that property and those rights were taken in the manner provided by law.[9]

---

[4]"A district may do any act necessary to furnish sufficient water in the district for any beneficial use."

[5]"A district may acquire the right to store water in any reservoir or to carry water through any conduit not owned or controlled by the district and may grant to any owner or lessee of the right to the use of any water the right to store the water in any reservoir of the district or to carry the water through any conduit of the district."

[6]"A district may contract to perform and perform any agreement with any number of persons or public corporations or agencies for the exchange, transfer, or delivery to or by either or both parties of any water right or water."

[7]"The title to all property acquired by a district is held in trust for its uses and purposes. The district may hold, use, acquire, manage, sell, or lease the property as provided in this division."

[8]Water Code section 22500 provides: "When a board determines by resolution entered upon the minutes that any property of the district is no longer necessary for district purposes, the district may for a valuable consideration sell or lease the property upon terms that appear to the board to be for the best interests of the district. Sales and leases authorized under this section include sales and leases to the State and to cities, counties, districts and other political subdivisions of the State."

[9]The minutes of District's board meetings, introduced in evidence by plaintiffs' counsel, indicate the board formally discussed the proposed transfer to City at its January 4, 1961, meeting and at several later meetings. At the October 24, 1961, meeting the following resolution was passed by the board:
"WHEREAS, the City of San Diego and the Helix Irrigation District entered into an agreement dated January 30, 1933, by the terms of which the City of San Diego acquired certain rights in the joint usage of the District's Murray Reservoir and the

■ The judgment in favor of City is supported by the findings and the findings are supported by the evidence. The water system operated by City includes the service of areas the service of which was an integral part of the water system in which Murray Reservoir was originally used, and that in which it was used until sold to District; the source of the water with which it originally was filled was one in which City then had and now has prior and paramount rights; the dam from which water flows onto plaintiffs' land is built upon land owned by City; a part of the land owned by plaintiffs' predecessor in interest, Junipero, the supplying of water to which was one of the rights provided for in the 1887 agreement, is owned by City; City, under a claim of right from District given in 1933, has had exclusive use for water storage purposes on plaintiffs' land since not later than 1941; such use has been open, notorious and uninterrupted during all that period and has been adverse to all the world except District, from which the claimed right came; in conjunction with the exercise of that right, City since 1948 has claimed and exercised the right to store water from the Colorado River in Murray Reservoir without asking or receiving express permission from anyone; the water brought to the reservoir by City has been by a 68″ pipeline which enters the reservoir at a point which is on property now owned by City, formerly owned by District; the dam and all but perhaps a small part of the flooded area are within the limits of the City.

We cannot quarrel with the law cited by plaintiffs with regard to abandonment and extinguishment of easements.[10] We do not find the cited

District acquired certain rights in the joint usage of the City's El Capitan Reservoir and in a section of the 48″ pipeline outlet from such reservoir; and

"WHEREAS, in the interim since the effective date of such agreement, changes in the methods of operation of both parties and experience gained in the years of operation of the jointly used facilities clearly indicate that mutual benefits would result from an adjustment in the respective rights and obligations of each party as provided for in such prior agreement; and

"WHEREAS, it is proposed that a new agreement clarifying and adjusting the prior agreement of January 30, 1933, (and certain supplemental agreements thereto) be entered into and said new agreement has been approved as to form by the legal counsel of each of the parties.

"Now, THEREFORE, BE IT AND IT IS HEREBY RESOLVED by the Board of Directors of Helix Irrigation District that the President and Secretary of said District be and they are hereby authorized and directed to execute said new agreement, for and on behalf of the District."

[10]Upon abandonment of an easement appurtenant, the servient estate reverts to the owner of the fee and is thereafter free of the servitude. (*Tamalpais etc. Co.* v. *N. W. Pac. R. R. Co.,* 73 Cal.App.2d 917 [167 P.2d 825]; *Smallpage* v. *Turlock Irr. Dist.,* 26 Cal.App.2d 538 [79 P.2d 752].)

" ' "As a general rule, in order to constitute an abandonment of an easement . . . there must be a nonuser accompanied by unequivocal and decisive acts on the part of the [dominant tenant], clearly showing an intention to abandon." ' [Citation.] As other cases point out, however, the owner's nonuser itself may under some circum-

rules compel a finding of abandonment or extinguishment under the facts in evidence or the facts as found by the court.

The judgment is affirmed.

Coughlin, Acting P. J., and Ault, J., concurred.

A petition for a rehearing was denied September 7, 1971, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied October 14, 1971.

---

stances constitute such an act. 'Where nonuser is evidence of an abandonment of a right, the question is one of intention, depending on the circumstances. . . .' [Citation.] 'And while nonuser alone does not extinguish the easement, a long continued nonuser is some evidence of an intent to abandon.' " (*Gerhard* v. *Stephens,* 68 Cal. 2d 864, 890-891 [69 Cal.Rptr. 612, 442 P.2d 692].)

The circumstances here do not show an abandonment within the rule as a matter of law.