Filed 12/28/22  Harris v. Dollar Point Assn. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| MICHAEL HARRIS, Individually and as Trustee, etc., et al.,<br><br>     Plaintiffs, Cross-defendants and Appellants,<br><br>     v.<br><br>DOLLAR POINT ASSOCIATION, INC.,<br><br>     Defendant, Cross-complainant and Respondent. | C094872<br><br>(Super. Ct. No. SCV0042030) |

Plaintiffs and cross-defendants Michael Harris and Anne Harris (collectively the Harrises)[1] are members of a recreation association, Dollar Point Association, Inc. (Dollar Point), by virtue of ownership of property (the Harris property) in Dollar Point's

_____

[1]     The Harrises sued in their individual capacities and as trustees of the Harris Family Trust.

1

subdivision.  Dollar Point owns a plot of land abutting the Harris property (Lot 62).

Since purchasing the Harris property in 1996, the Harrises have used a 30-foot-wide strip

of Lot 62 that abuts their backyard (encroachment area) to varying degrees.  In 2018, the

Harrises sued Dollar Point alleging they adversely possessed the encroachment area and

held a prescriptive easement over stone-lined steps and a path (stone steps) adjoining the

encroachment area to a parking lot.  Dollar Point denied the Harrises adversely possessed

the encroachment area or established a prescriptive easement over the stone steps.  Dollar

Point also filed a cross-complaint seeking to quiet title in their favor against the Harrises

and enjoin the Harrises from erecting or maintaining encroachments on Lot 62.

Following a bench trial, the trial court found the Harrises failed to prove their

claims of adverse possession and prescriptive easement, ordered title quieted in favor of

Dollar Point against the Harrises, and enjoined the Harrises from wrongfully encroaching

onto Lot 62.

On appeal, the Harrises contend insufficient evidence supports the trial court's

findings pertaining to its adverse possession and prescriptive easement rulings.  In their

reply brief, the Harrises withdrew their challenge to the trial court's prescriptive

easement ruling.  We disagree with the Harrises remaining contention and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The parties do not dispute the underlying facts of the case.  Given the lack of

disputed facts, we adopt the facts as found by the trial court in its statement of decision.

"In 1996, [the Harrises] . . . purchased a residential property at 60 Lassen Drive,

Tahoe City ('Harris property').  In 2008 they conveyed their interests to the Harris

Family Trust.  The Harris property is identified on maps as Lot 292.  To the immediate

south of the Harris property is property owned by [Dollar Point] and identified on maps

as Lot 62.  [Dollar Point] is comprised of members who own residential property in the

Dollar Point subdivision.  [Dollar Point] describes itself as a private, non-profit,

recreational association, as opposed to a homeowners' association or common interest

2

development.  [Dollar Point] owns and maintains Lot 62 for the benefit of [Dollar Point] members.  Lot 62 includes a beach area on the shore of Lake Tahoe, a pier and moorings, tennis courts, open space and a parking lot used by members of [Dollar Point].  To the west of the Harris property is Lot 291, referred to . . . as the 'Leydecker property.'  To the east of the Harris property is Lot 293, referred to . . . as the 'Good property.'

"This property dispute primarily concerns a 30-foot wide strip of land on Lot 62 abutting the entire 70.47-foot long southern border of the Harris property, as well as the [stone] steps below leading to a parking lot and tennis courts used by [Dollar Point] members."  "[T]his largely grassy area was generally referred to as the 'encroachment area.' "  The encroachment area is depicted in the attached appendix, *post*.

"Communications between the parties over the years are largely reflected in emails, [Dollar Point] board meeting minutes and letters.  Photographs and videos depict the relevant properties at key points in time.  However, the interpretations of the evidence, and the legal effect of the respective conduct of the parties, lie at the heart of this lawsuit.

"As far back as 1976, [Dollar Point] noticed encroachment onto its Lot 62 from several property owners, including Jim Corkery, a predecessor owner of [the Harris property], whose lawn extended into Lot 62.  In 1989 and 1991, [Dollar Point] communicated with the next owner of the property, James Campodonico, informing him that landscape improvements were encroaching onto Lot 62.  After plaintiffs purchased the property, [Dollar Point] attorney [Dean] Headley informed plaintiffs that [Dollar Point] was 'willing to allow the landscaping, steps and fence to remain' in the encroachment area, just as it had with the predecessor owner.  [Dollar Point] proposed a license agreement.  When the Harrises purchased their property they were of the apparent belief that the encroachment area was part of the property purchased from Campodonico. This led to a lawsuit by the Harrises against Campodonico.

"In November 1999, [Dollar Point] proposed a 5-year license agreement whereby [the Harrises] could continue to maintain the landscaping in the encroachment area. The Harrises rejected the proposal, instead offering through their attorney to purchase the encroachment area. [Dollar Point] rejected the offer. Through negotiations that followed, the Harrises offered to sign a license agreement if it remained effective until either plaintiffs died or the property was sold. Their attorney suggested they might pursue a claim for prescriptive rights if [Dollar Point] did not accede to their offer. By letter of February 18, 2000, [Dollar Point]'s attorney Headley responded: 'You have got to be kidding!' Mr. Headley pointed out that 'The use of [Dollar Point]'s property by the Harrises and their predecessor has been with permission.' In May 2000, the Harrises entered a 5-year license agreement with [Dollar Point], with automatic one-year renewals. This agreement granted the Harrises a license for the non-exclusive use of the encroachment area to maintain 'existing landscaping and related improvements, excluding fencing . . . including existing lawn, shrubs and steps.' Use of the encroachment area for other purposes was expressly prohibited by the license agreement.

"In 2002, the Harrises installed a wood and wrought iron fence at or near the southern boundary of their property. Later, in May 2007, the Harrises' landscaper installed irrigation lines in their backyard, extending beyond the fence into the encroachment area. In November 2007 and, as followed up by direction to its attorney at a meeting in February 2008, the [Dollar Point] Board determined to notify the Harrises (and neighboring property owner Leydecker) that the license agreement was being terminated and that improvements must be removed. The Harrises were notified that the 'landscaping and related improvements, including irrigation, remaining on [Dollar Point] property [were] to be removed within 10 days of the end of the present term, i.e. November 25, 2008.' [Dollar Point] and Ms. Leydecker subsequently entered into a new license agreement that included removal of a portion of the fence that separated her property and the Harris property and which extended onto Lot 62. The fence extended

4

onto Lot 62 from a point originating at the intersection of the Harris Property and the Leydecker Property. After this fencing was removed in 2009, it became more feasible for renters or users of the Leydecker property to cross behind the southern property lines of the Leydecker and Harris properties on their way toward the tennis courts and beach access on Lot 62.

"Neither side presented testimony from a surveyor at trial. Suffice it to say, however, that there was a lack of agreement or understanding between the parties as to whether the fence installed by the Harrises in 2002, in fact, encroached on to Lot 62. In August 2011, [Dollar Point] sent a letter to Mr. Harris in which it indicated from surveyor's markers that 'some or all of the wrought iron fence [Mr. Harris] installed [was] on [Dollar Point] property.' The letter indicated that [Dollar Point] 'would like to come to a mutually acceptable arrangement regarding the fence' as well as 'the lawn that [was] on [Dollar Point] land.' According to his subsequent emails to [Dollar Point], and consistent with his trial testimony, it appears Mr. Harris remained unconvinced the fence was on [Dollar Point] property. In a response to [Dollar Point] on August 11, 2011, Mr. Harris responded in part: [¶] 'I do not know for certain if any portion of our fence is or is not on [Dollar Point] property. However, if any portion of our fence is on [Dollar Point] property it was not our intention to place the fence on [Dollar Point] property. To my knowledge the property that we own is determined by a property map and an accurate survey[,] not based on the location of any fence. We did not and will not use the location of the fence as some sort of strategy to claim ownership to land which is not legally ours . . .' As the issue progressed, on November 29, 2011, [Dollar Point] sent the Harrises a proposed new license agreement. The cover letter pointed out that the improvements that had been allowed under the previous license agreement 'should have been removed when the agreement was terminated.' The proposed agreement recited that 'certain lawn, irrigation and a portion of fencing associated with the Harris Property ha[d] been installed on [Dollar Point] Property.' The proposed agreement included provisions

5

whereby (1) the Harrises would have been granted a nonexclusive easement to maintain their improvements in the area no[t] 'extending more than 22 feet onto [Dollar Point] Property as measured from the boundary between [Dollar Point] Property and the Harris Property;' and (2) the Harrises would claim no right, title or interest in [Dollar Point] Property other than as expressly set forth in the proposed license agreement. The proposed agreement would have allowed the landscaping and irrigation installed in the encroachment area to remain in place during the term of the agreement. The proposed agreement was never signed.

"On December 13, 2011, Mr. Harris wrote [Dollar Point] and recounted his perspective of the history of the fence/boundary line issue. He reiterated the statement in his August 16, 2011 email to [Dollar Point] in which he stated[,] 'We did not and will not use the location of the fence as some sort of strategy to claim ownership to land which is not legally ours.' He added that '[He] thought that [his] written reply to the concerns of the Board would lessen any concern that [he] was up to no good with [his] fence.' Mr. Harris repeated that [Dollar Point] 'ha[d] not communicated that [their] fence [was] definitively on the [Dollar Point] property and the board ha[d] not provided [him] with any evidence showing that [their] fence [was] on [Dollar Point] property.' Mr. Harris stated that if the fence was determined to be on [Dollar Point] property, it would be moved so it was entirely on the Harris property. He later appeared at a [Dollar Point] board meeting on January 13, 2012 and reiterated he would not use the location of the fence to claim property that was not his. Ultimately, [Mr.] Harris removed the fence in late January 2012. According to [Dollar Point]'s attorney Headley, [Dollar Point] decided not to require removal of the lawn in the encroachment area.

"Former [Dollar Point] board member Lynn Thompson recalled that during this timeframe Mr. Harris was very concerned that the [Dollar Point] board was upset with him regarding any claim for property rights and that 'he did everything he could to assure [Dollar Point] that he was not seeking any property rights.' In an email of January 25,

6

2012, Ms. Thompson recounted a conversation with Mr. Harris in which, among other things, (1) he agreed that survey stakes indicated his fence was 18 inches into [Lot 62] on the west side and approximately [eight] inches on the east side; (2) that [Dollar Point] had his permission to move the fence to the survey boundary; (3) that any irrigation on [Dollar Point] property could be removed; and (4) that he did not care about maintaining the lawn in the encroachment area and that the area could return to its natural state."

On July 11, 2012, Mr. Harris "emailed Ms. Thompson, indicating that the fence had been removed and that the landscapers would '*remove the sprinklers from* [*Dollar Point*] *property* and move them back to [his] side of the property line.' He also stated he would like to have the surveyor stakes removed and that '. . . there is no dispute regarding where the property line is.' ([Italics] added [by the trial court].)"

"On September 13, 2012, Mr. Harris informed [Dollar Point] that his landscaper had removed the irrigation lines from the encroachment area in July. On October 22, 2012, Mr. Harris emailed Ms. Thompson to ask if [Dollar Point] could trim tree branches on its property that impeded his DirecTV reception. In the course of her response on October 23, 2012, Ms. Thompson asked him to confirm that his irrigation had been removed from [Dollar Point] property. Mr. Harris replied within an hour, stating: 'Yes all of the irrigation has been removed according to my landscaper and what I could see. If the board sees anything that is not consistent with what needed to be done just have them let me know so we can take care of it.'

"On July 24, 2013, Mr. Harris emailed [Dollar Point] Board-member Thompson, informing her that he had gotten a dog and was going to reinstall the fence along the back property line in order to contain the dog. The fence installer had communication with surveyor Keith Masuda and Mr. Harris believed Mr. Masuda came to the property to verify property line markers from a [Dollar Point] survey. Mr. Harris had this done 'so [they could] place the fence properly.' " "[A]t various times, the Harrises used the

[encroachment] area to play games, including bocce ball and cornhole, and for occasional parties or social gatherings."

"After an approximate [four]-year gap in any significant communication between the parties, on August 8, 2017[,] Mr. Harris wrote a lengthy email to [Dollar Point], complaining that the Harrises' privacy and security was being impacted by foot traffic adjacent to his property line. He explained that the neighboring Leydecker property (Lot 291) had its backyard and leased area redone 'and they removed some of the vegetation on [Dollar Point] property to create a path which runs directly along [the Harrises'] property line.' He indicated the previous path on Lot 291, which ran from the south of the property to the tennis courts on Lot 62, had not created any issue during his previous 18 years of ownership of [the Harris property]. However, according to Mr. Harris, the new path was being used constantly and there was a constant flow of renters to and from [the Harris property] and the tennis courts and beach to the south. In particular, he noted the Leydecker house had become a rental and that the renters were walking across Lot 62 toward the lake area. In a later email of August 25, 2017, Mr. Harris explained that use of the 'new path' by persons had actually been a problem for many years: 'The "new" path started being used around the time that the house next door was remodeled (both the house and the landscaping).' In order to remedy his concern, Mr. Harris proposed extending the existing fence by [six] feet, at his expense, so that 'access to the new pathway is eliminated.' He stated that he 'would not "own" the fence' and the 'fence's existence would be at the discretion' of [Dollar Point]. Mr. Harris reiterated his concerns at the next [Dollar Point] board meeting. After this board meeting of August 18, 2017, several board members inspected the encroachment area and confirmed there were no visible obstructions on Lot 62 that would prevent persons from crossing behind the Harris property.

"Mr. Harris followed up with an email on August 25, 2017[,] to Debbie Wolf at [Dollar Point]. He reiterated his concerns regarding privacy caused by persons using 'the

new path' that started being used 'around the time that the house next door was remodeled (both the house and the landscaping).' Mr. Harris stated that when the remodel occurred, 'vegetation was cleared from [Dollar Point] property to create an entry to this new path.' He expressed that the new path 'on [Dollar Point] property ha[d] created a stressful situation' which impacted the Harrises enjoyment of their home. The [Dollar Point] board was unable to immediately address his proposal and concerns, which were deferred to the next [Dollar Point] board meeting on October 19, 2017. A day before the meeting, Mr. Harris emailed the board with another suggestion to allay his concerns. He suggested he could 'lease the small area of [Dollar Point] property so that [he] could make a few improvements.' He further stated 'I do think that the board has the ability to regulate access on [Dollar Point] property.' The [Dollar Point] board opted not to grant his request. [Dollar Point] expressed a concern that it did not want to allow anyone to have exclusive use of [Dollar Point] property." The evidence presented at trial "showed that various [Dollar Point] members would walk their dogs through the encroachment area. Other evidence included that tennis players using the tennis courts would fetch tennis balls beyond the courts on Lot 62."

"On September 24, 2018, prior to the [Dollar Point] board meeting, board members inspected [Dollar Point] property, including Lot 62. They did not observe any obstructions, fencing, new landscaping or irrigation on Lot 62. The patch of grass in the encroachment area was still present. The situation would soon change. On October 11, 2018, unbeknownst to [Dollar Point], the Harrises' landscape maintenance company . . . planted two willow trees because, according to Mr. Harris, he wanted to screen the view of the tennis courts. The two willow trees were planted just south of the lawn area in the encroachment area. The landscapers also installed new irrigation drip tubing in the encroachment area to irrigate the two willow trees. At some point thereafter, Mr. Harris collected some rocks from his property and put them between the end of the Leydecker fence and the willow trees. Mr. Harris acknowledges he did not advise or seek

9

permission of [Dollar Point] to put the rocks, plantings and irrigation lines in the encroachment area . . . Mr. Harris acknowledged he had the irrigation drip lines installed in the encroachment area, even though he had been asked by [Dollar Point] to remove sprinklers from the area in 2012 after the license expired.

"On November 1, 2018, several weeks after installing the irrigation drip lines in the encroachment area, planting two willow trees in the area and moving rocks between the trees and Leydecker fence, the Harrises filed their complaint in this action.

"During the Memorial Day weekend in May 2019, several [Dollar Point] Board members inspected Lot 62 behind the Harris property and were surprised to see changes had been made since the previous August.  At that time, they noticed that some of the natural growth on the hillside had been cut, that grass on [Dollar Point] property appeared to have been recently been [*sic*] aerated, that shrubs had been planted, that rocks had been placed at the end of the fence line on [Dollar Point] property between the Harris and Leydecker properties, and that shrubs had been planted near those rocks.  [Dollar Point] concluded this was an attempt by Mr. Harris to create a blockade by installing a new drip line, shrubs and rocks in the encroachment area in order to prevent renters from the Leydecker property and other persons from passing by the southern boundary of his lot and across Lot 62."

The Harrises filed the operative complaint on January 31, 2019.  At trial, the Harrises alleged three causes of action.  The first cause of action sought "a declaration that [Dollar Point could not] restrict access [to] or use of Lot 62 where it abuts the Harris property"; the second cause of action sought "to quiet title by adverse possession of" the encroachment area; and the third cause of action sought "to establish a prescriptive easement" for ingress and egress over the stone steps.

Dollar Point's cross-complaint alleged three causes of action.  The first cause of action sought to quiet title to the encroachment area and to Lot 62; the second cause of action sought "a declaration in [Dollar Point's] favor as to the rights and interests of the

10

parties to the encroachment area and Lot 62"; and the third cause of action sought "injunctive relief to restrain the Harrises from interfering with the use of Lot 62 by [Dollar Point]'s members."

Following a bench trial, the trial court found that the Harrises failed to prove adverse possession because they did not demonstrate they had exclusive possession of the encroachment area for a continuous five-year period or that their possession was open, notorious, and hostile to the true owners. The trial court also found the Harrises failed to prove they had a prescriptive easement of the stone steps because the Harrises, like other Dollar Point members, had permission to use the steps. Given these findings, the trial court quieted title of Lot 62 in Dollar Point's favor against the Harrises. It also enjoined the Harrises from wrongfully encroaching onto Lot 62, specifically including "by cultivating grass, installing irrigation, planting in the encroachment area, installing fences or other improvements, by placing rocks or other impediments to foot travel across Lot 62, or by interfering with use of the steps."

The Harrises appeal.

DISCUSSION

The Harrises contend insufficient evidence supports the trial court's findings that they failed to establish adverse possession of the encroachment area and that they failed to establish they had a prescriptive easement of the stone steps leading from the encroachment area to the parking lot. We disagree.

The standard of review favors the judgment. The Court of Appeal "views the evidence in a light most favorable to the respondent" and "factual matters will be viewed most favorably to the prevailing party . . . 'giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment.' " (*Orange County Employees Assn. v. County of Orange* (1988) 205 Cal.App.3d 1289, 1293; see *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 556-557.) "The substantial evidence standard applies to both express and implied findings of fact made

by the superior court in its statement of decision rendered after a nonjury trial." (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.)

To establish they acquired title by adverse possession, the Harrises must show: (1) they possessed the encroachment area under a claim of right or title; (2) they actually, openly, and notoriously occupied the encroachment area in a manner that gave reasonable notice to Dollar Point; (3) their possession and occupancy was adverse and hostile to Dollar Point; (4) they continually possessed and occupied the encroachment area for five years; and (5) they paid all property taxes levied and assessed on the encroachment area during that five-year period. (*Main Street Plaza v. Cartwright & Main, LLC* (2011) 194 Cal.App.4th 1044, 1054.)

The trial court found the Harrises failed to prove adverse possession because they did not demonstrate they had exclusive possession of the encroachment area for a continuous five-year period or that their possession was open, notorious, and hostile to the true owners. Because we affirm the trial court's finding the Harrises' possession was not hostile for five continuous years, we need not address the court's findings on the other elements of adverse possession.

For purposes of a claim of adverse possession, "[t]o be considered hostile, the acts relied upon must operate as an invasion of the right of the party against whom they are asserted." (*Laubisch v. Roberdo* (1954) 43 Cal.2d 702, 706, citing *City of San Diego v. Cuyamaca Water Co.* (1930) 209 Cal. 105, 133.) "[T]he hostility requirement 'means, not that the parties must have a dispute as to the title during the period of possession, but that the claimant's possession must be adverse to the record owner, "unaccompanied by any recognition, express or inferable from the circumstances of the right in the latter." ' " (*Gilardi v. Hallam* (1981) 30 Cal.3d 317, 322-323.) "[W]hen the California Supreme Court referred to ' "any recognition . . . of the right [of the record owner]" ' . . . [citation], it meant the recognition by the claimant of the same right or rights asserted by the claimant. In other words, a claimant cannot show the use of a right was hostile when,

12

simultaneous to that use, the claimant recognized that the very same right was held by the owner of record." (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 940.)

" 'In most of the cases asserting [the requirement of a claim of right], it means no more than that possession must be hostile, which in turn means only that the owner has not expressly consented to it by lease or license or has not been led into acquiescing in it by the denial of adverse claim on the part of the possessor.' " (*Felgenhauer v. Soni* (2004) 121 Cal.App.4th 445, 450.) "[T]he grant of adverse possession or a prescriptive easement requires not innocent intent, but an intent to dispossess the owner of the disputed property, whether the encroacher is acting deliberately or negligently." (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 770.) For example, "[w]here land is occupied through mistake as to the property line with the intention to claim only to the true line, wherever it may be, a claim for adverse possession of the mistakenly occupied land will be denied." (*Brewer v. Murphy*, *supra*, 161 Cal.App.4th at p. 940, italics omitted.)

The Harrises argue they were in hostile possession of the encroachment area after November 2008 when the license between Dollar Point and the Harrises was revoked. The Harrises point to their refusal to stop encroaching and remove the grass from the encroachment area. But the continued presence of the grass is of little consequence when compared to the Harrises' other conduct. In August 2011 and December 2011, the Harrises e-mailed Dollar Point and said they would not use the location of the fence to claim land that did not legally belong to them. Mr. Harris made the same statement at a January 2012 Dollar Point board meeting. At the end of January 2012, Mr. Harris also acknowledged in an e-mail that his fence encroached on Dollar Point land and that Dollar Point could remove the fence and the irrigation in the encroachment area. The Harrises further recognized Dollar Point's rights to the encroachment area when they removed the fence in January 2012 and the irrigation in July 2012. This was before the five years of continuous use could be established in November 2013 after termination of the license

13

agreement in November 2008.  The Harrises' respect of the boundary line and removal of improvements are reasonably inferred as efforts to gain Dollar Points acquiesce to other improvements in the encroachment area or, at the very least, the Harrises' recognition of Dollar Point's possessory rights to the encroachment area.

The Harrises' continued maintenance of the grass is not enough to demonstrate hostile possession of the encroachment area, contrary to their claim on appeal.  The Harrises assert they "mowed, weeded, aerated, edged, fertilized, watered, trimmed, raked and otherwise maintained the lawn; they likewise maintained and replaced shrubs and bushes in the area in dispute."  After removing the fence and irrigation, however, the Harrises reached out to Dollar Point regarding other issues pertaining to the encroachment area.  In October 2012, the Harrises requested Dollar Point trim tree branches on Dollar Point property.  In July 2013, the Harrises reinstalled the fence, but first contacted Dollar Point and consulted a survey to correctly install the fence along the boundary line between their backyard and the encroachment area.  Then, in August 2017 they expressed concern over the years of foot traffic behind their fence that established a path through the encroachment area to the stone steps leading to the parking lot.  The Harrises reached out to Dollar Point and suggested a solution; to extend their fence onto Dollar Point property to cut off access to the path.  The Harrises claimed the fence would exist at Dollar Point's discretion.  A little over a year later, and without consulting Dollar Point and in disregard of Dollar Point's possessory rights to the encroachment area, the Harrises reinstalled the irrigation, planted bushes and trees, and moved rocks to obstruct the path through the encroachment area.

From the timeline recounted above, there is no continuous five-year period in which the Harrises disregarded Dollar Point's ownership of the encroachment area.  We agree with the Harrises that this is not a case about a mistaken property line and the Harrises' knowledge of Dollar Point's ownership of the encroachment area does not defeat their adverse possession claim.  But the evidence did not demonstrate that the

14

Harrises used the encroachment area as true owners of the disputed property. Harris assured Dollar Point that was not his intent in 2011 and he removed a majority of his improvements, with the exception of the grass, from the encroachment area. While the Harrises thereafter watered and tended to the grass in the encroachment area, which abuts their own backyard, they continuously acknowledged and respected Dollar Point's ownership of the encroachment area. When the Harrises needed branches trimmed, they called Dollar Point. The Harrises consulted with Dollar Point and verified property line markers from a prior Dollar Point survey before constructing the fence on the boundary line between the properties. When the Harrises wanted to solve the problem of a path through the encroachment area, they contacted Dollar Point. Through this conduct, the Harrises did more than acknowledge Dollar Point's ownership of the encroachment area, they respected and deferred to Dollar Point's ownership when it came to the encroachment area. Consequently, the Harrises cannot show their possession was hostile, and sufficient evidence supports the trial court's finding the Harrises did not adversely possess the encroachment area.

## DISPOSITION

The judgment is affirmed. Dollar Point is awarded its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

/s/
Robie, Acting P. J.

We concur:

/s/
Hull, J.

/s/
Duarte, J.

16